## VAN HORNE and others *against* D. FONDA.

Where a person, named as executor in a will, but who never qualified as such, took possession and disposed of part of the personal estate of the testator, and paid some of his debts: *Held*, that these acts were proof of his election to act as executor, and that he was chargeable as executor.

An executor or trustee cannot buy in mortgages, judgments, or other debts of the testator, for his own benefit, nor can he, in any way, deal or traffick with the estate, for his own emolument.

Admitting that one tenant in common may, in a particular case, purchase in an outstanding title, for his own benefit; yet where two devisees are in possession of land, under an imperfect title, devised to them by their common ancestor, one of them cannot buy up an outstanding, or an adverse title, to disseise or expel his co-tenant, but such purchase will enure to their common benefit, subject to an equal contribution to the expense.

THE bill filed *July* 28, 1818, by *Abraham A. Van Horne* and *Jane* his wife, and *Jellis H. Fonda*, stated, that the plaintiffs, *Jane* and *Jellis*, were the only children and heirs at law of *Henry V. Fonda*, late of *Caughnawaga*, in *Montgomery* county, deceased. That *Jellis Fonda*, father of *H. V. F.*, on the 23d of *May*, 1791, made his will, by which, after sundry legacies and bequests, he devised all the residue of his estate to his two sons, *Henry* and *Douw*, the de-

fendant; and he nominated his son *Douw*, his son-in-law *John Yates*, his brother *A. Fonda*, and his friends *H. Fry* and *A. Van Vechten*, his executors. The testator died the 23d of *June*, 1791, seised, &c. of real and personal estate. The defendant, *John Yates*, and *A. Fonda*, proved the will, and qualified as executors, before the surrogate of *M.*, the other two persons named having declined; but the defendant was the sole acting executor, and took possession of all the real and personal estate of the testator, *J. F.*, not specifically devised; but he never filed any inventory of the personal estate. *Henry V. Fonda* having made his will, died the 23d of *April*, 1799, leaving the plaintiffs, *Jane* and *Jellis*, his only children and heirs at law, and a widow. The plaintiff, *Jane*, was born the 6th of *November*, 1792, and married the plaintiff, *Van Horne*, the 16th of *December*, 1810; the plaintiff, *Jellis Y. F.*, was born the 12th of *March*, 1795. *Henry V. F.*, by his will, devised his farm, &c. at *C.* to his wife, to hold the same until his son *Jellis* should arrive at the age of twenty-five years; and devised the one moiety of the same to the plaintiff *Jane*, and the other moiety to the plaintiff *Jellis*; but his wife to hold, during her natural life, the moiety devised to his daughter *Jane*. He empowered his executors, or the major part of them, to sell and convey his real estate, or such part thereof as might be necessary, for the payment of his debts; and he made his two children, *Jane* and *Jellis*, his residuary devisees. He declared the bequest to his wife to be in lieu of dower; and appointed his brother *Douw*, the defendant, his uncle, *John F.*, and *Evert Yates*, and *James Lansing*, his executors. The bill further stated, that, soon after the death of *Henry V. F.*, the executors named in his will, met for the purpose of determining whether they would undertake the executorship; on which occasion, the defendant exhibited a statement of the debts owing by *H. V. F.*, amounting to 1,528*l.* 8*s.*, and of debts due to him, amounting to 222*l.* 15*s.*, which he represented as correct. That at this meeting, the defendant proposed that a part of the old

*Caughnawaga* farm should be sold, for the payment of the debts of *Henry V. F.*; to which *John F.* objected, and stated, that the estate of *Henry V. F.* was entitled to one half of the moneys which the defendant had received, or was to receive, from the estate, as a compensation for lands in the *Royal Grant*, which *Jellis F.*, deceased, had purchased from the *Indian* children of Sir *William Johnson.* That the defendant answered, that *Jellis Fonda's* title was deficient; and that he, the defendant, had been to *Upper Canada* to get a conveyance, and intimated that he should not pay over any of the moneys to the estate of *Henry V. F.* That *John F.* was so incensed at the conduct of the defendant, that he refused to prove or act under the will of *Henry V. F.;* and the meeting was accordingly broken up, and neither he, nor *James Lansing,* nor *Evert Yates,* took upon themselves the execution of the will.

That *Jellis F.* purchased 2,000 acres of land, in the *Royal Grant,* of *Brant Johnson,* (a natural son of Sir *William Johnson,*) and who executed a deed in fee for the land, dated *July 8,* 1789. That on the 28th of *December,* 1790, *Jellis F.* and his wife conveyed the same land to *Abraham G. Lansing,* and his heirs, &c. in trust, for *Jellis F.,* his heirs and assigns forever. That *A. G. Lansing,* on the 15th of *August,* 1791, conveyed certain lots, parcel of the 2,000 acres, to *John Lansing, jun.* on the same trust, for the benefit of *Jellis F.,* &c. That *John L., jun.* and his wife, and *Abraham G. L.* and his wife, on the 19th of *December,* 1793, released the whole 2,000 acres to *Henry V. F.* and *Douw F.,* as tenants in common, and entitled thereto, under the will of their father *Jellis F.* That, it being supposed that the land had been forfeited to the State, by the attainder of Sir *John Johnson,* the only son and heir at law of Sir *W. J.,* or by the attainder of *William J.* and *Brant J.,* the devisees thereof, and been sold by the commissioners of forfeitures; for the purpose of avoiding controversy, and with a view to facilitate an application to the Legislature,

by vesting the legal title in the defendant solely, and giving him a discretionary power as to the terms of compromise with the State, it was agreed between *H. V. F.* and the defendant *D. F.*, that *H.* should convey to the latter all his interest in the 2,000 acres; which was accordingly done, by a deed from *H.* and his wife, dated *May* 3, 1794. That the commissioners, on behalf of the State, agreed with the defendant, to pay him, in extinguishment of their claim, three dollars and twenty-five cents an acre; and the defendant and his wife, accordingly, on the 20th of *March*, 1799, released the 2,000 acres to the State, and the defendant, afterwards, received the sum of six thousand five hundred dollars from the State, to the one half of which sum, *H. V. F.* was, and his legal representatives, since his death, were justly entitled. That *H. V. F.* and his wife, on the 13th of *May*, 1794, executed a mortgage of the rents and reversions of certain lots in the *Royal Grant*, being part of the residue of the real estate of *Jellis F.*, devised to *Henry V. F.* and *D. F.*, and assigned to *H. V.* in severalty, for securing the payment of 250 dollars and the interest. That in *February*, 1800, the defendant procured an assignment of the mortgage to him from *J. Y.*, and proceeded to sell the premises, under colour of a power contained in the mortgage, and purchased them himself; and has, thereby, possessed himself of the rents. That the pretended power was void, as *Henry V.* was, at the time of its execution, under the age of 25 years. That the defendant obtained an assignment of a judgment of *Adam Snell* against *Henry V. F.*, under which, in 1814, he sold 100 acres of the land. That the payments made on the mortgage, and the rents received, or which might have been received by the defendant, far exceeded the principal and interest due on the mortgage. That in *March*, 1803, *Worden Hammond* married the widow of *Henry V. F.*, and died the 29th of *July*, 1813. That *Myndert B. Wimple* recovered a judgment in 1806 or 1807, against *Hammond* and his wife, the plaintiffs, *Jane* and *Jellis H. F.* as heirs and devi-

sees of *Henry V. F.* on his bond for 50 pounds, dated *July* 10th, 1792. That *Peter Putman* also recovered a judgment against the same persons, as heirs and devisees of *Henry V. F.*, in 1806 or 1807, on his bond for 55 pounds, dated *September* 19th, 1796. That execution, on these judgments, were issued in 1807, under which the *Caughnawaga* farm, or land devised by *Jellis H. F.* deceased, to *H. V. F.*, amounting to above 339 acres, was sold by the sheriff, and the defendant became the purchaser. That the defendant, at the time of sale, declared publicly, that he intended to purchase the land for the benefit of his brother's infant children, the plaintiffs *Jane* and *Jellis H.*; in consequence of which declaration there was no competition, and the land was struck off, in a few minutes, to the defendant, for a nominal price. That the defendant since, and now pretends that he fairly purchased the lands at the sheriff's sale for his own benefit, and paid the sheriff 586 dollars and 75 cents for the same; and falsely and fraudulently sets up a mortgage in fee of the farm, by *Henry V.* dated 10th of *January*, 1799, to *John Jacob Beekman*, his father-in-law, and to the defendant, for securing the payment of 157 pounds, according to the condition of a bond to *J. J. B.* and 380 pounds to the defendant, with interest, from the date of the mortgage. That the defendant had the entire control of the executions and sales; and never paid any part of the money bid by him for the lands to the sheriff. That the farm so sold was under high improvement and cultivation, and of great value; and that two acres of the land would, at a fair sale, have sold for enough to have satisfied the executions and costs. That he mortgage to *J. J. B.* and the defendant, was taken when *Henry V.* was very ill; and that the sum of 380 pounds, was included in the mortgage, under a promise of the defendant that he would advance the money to meet the wants of *Henry V.*, but that none of it was paid. That the defendant obtained from the widow of *Henry V.* a release of her dower in the farm, and in lieu thereof, assigned to her a part of the land for life,

and afterwards procured from her a release of the part so assigned to her. That in 1816, the defendant attempted to extort from the plaintiff, *A. Van Horne*, a recognition of the defendant's right to the farm; but having failed to obtain it, he brought an action of ejectment against *A. V. H.* and turned him out of possession. That the widow of *Jellis F.* continued in possession of the farm with the consent of the defendant, from the death of her husband until she died, in *February*, 1804, when the defendant possessed himself of the stock, &c. on the farm.

The bill *prayed* for a discovery and an account of the real and personal estate of *Jellis F.*, not specifically devised, a moiety of which belonged to *Henry V. F.*, and of the rents, profits, proceeds, &c. and for general relief.

The defendant, in his answer, gave schedules of the real and personal estate of *Jellis F.*, and of the personal estate of the widow. He stated that *Henry V. F.* lived with his mother, on the *C.* farm, until his death. He admitted, that he was the active executor of *Jellis F.*, and the receipt of the rents and profits of the real estate, and of the personal estate, as stated in the schedules. That he made no inventory of the personal estate; but he made a statement of the debts and credits, as set forth in schedules. That he received a letter, on the 16th of *March*, 1799, from *Henry V. F.*, a short time before his death; and that he promised *Henry V. F.* to take care of his children. That he made the statement to his co-executors of the debts of *Henry V. F.*, as mentioned in the bill, and that he had paid the debts marked " settled," out of his own moneys, and taken an assignment of the securities for them; and that the debts were marked " settled," in the statement, after the same were paid and assigned to him, and after the statement had been exhibited at the meeting of the executors. He denied that he acted as executor of *Henry V. F.*, or that he received and paid debts as his executor. He admitted that Sir *William Johnson* died seized of the 2,000 acres in the *Royal Grant*, and that he

devised 1,000 acres thereof, to his son *Brant*, and 1,000 acres to his son *William;* but ne denied that *William* ever sold and conveyed his 1,000 acres to *Brant*. He admitted the conveyance of the 2,000 by *Brant J.* to *Henry V. F.* and that the conveyance was delivered up to the State commissioners, on the 17th of *March*, 1799. He admitted that *Jellis F.*, on the 28th of *December*, 1790, sold and conveyed the 2,000 acres of land to *Abraham G. Lansing*, for the consideration of one hundred pounds, in fee, with warranty; but he denied that it was upon any trust whatever, express or implied, for the benefit of *Jellis F.* That *Abraham G. Lansing* sold and conveyed the lots mentioned in the bill, to *John Lansing*, jun., but not upon any trust whatever. That *Abraham G. L.* and *John. L.*, jun., soon afterwards, discovered that *Brant J.* had no right or title to the 1,000 acres devised to *William J.*, and they threatened to prosecute the executors of *Jellis H. F.* on the covenant in his deed. That the defendant and *Henry V. F.*, being advised that the title of *Brant J.* to the 1,000 acres, was not valid, on the 19th of *December*, 1793, conveyed to *Abraham G. L.* and *John L.*, 2,250 acres in *Fonda's Patent*, and 400 acres in the third allotment of the *Royal Grant*, in lieu thereof. And on the 19th of *December*, 1793, *Abraham G. L.* and *John L.* conveyed back to the defendant and *Henry V. F.* the 2,000 acres. That on the 3d of *May*, 1794, *Henry V. F.* conveyed his right to the 1,000 acres, devised to *Brant J.*, to the defendant, for one hundred pounds, which was a valuable consideration, truly paid; and he denied that the conveyance was for the purpose, or on the terms set forth in the bill. That on the 29th of *May*, 1795, he purchased of *Moses Johnson*, son and heir at law of *William Johnson*, the devisee of Sir *Willham J.*, his right and title to 1,000 acres, for the consideration of 600 dollars. That the defendant, afterwards, released his right to the 2,000 acres, to the People of the State, for 6,250 dollars; but he denied that *Henry V. F.* was, in any way, concerned in this compromise with the

Commissioners, or that he was entitled to any part of the money received.

He denied all fraud or unfairness in the purchase of *Henry V. F.,* but averred that the same was for a valuable consideration ; and that on the 24th of *April,* 1794, he conveyed to *Henry V. F.,* 1,000 acres of land in the Royal Grant, in satisfaction of all his right and interest to the said 1,000 acres of *Brant J.,* pursuant to an agreement between them.

He admitted the mortgage of *Henry V. F.,* of the 13th of *May,* 1794, to *Joseph Yates,* of part of the estate devised to him and *Henry V.,* as tenants in common; but he averred that he had released his right, &c. in the premises to *Henry V. F.,* in consideration of the release by him of his right in the 1,000 acres. He admitted that he and *Henry V. F.,* in 1793, leased lots to five different persons, whom he named, and that *H. V. F.* afterwards released the reversion of one of the lots, to the lessee, *Flint.* That *Jellis H. F.,* the 7th of *October,* 1788, executed four leases of 100 acres each, in lot No. 17. included in the mortgage to *J. Yates.* That the defendant, on the 4th of *February,* 1800, purchased *Yates'* mortgage, for 875 dollars and 35 cents, and sold the mortgaged premises, by virtue of the power contained in the mortgage, the 20th of *August,* 1800, for 400 dollars ; and became himself the purchaser. That the sale and purchase were fair and *bona fide.* He admitted, that at the time that *Henry V. F.* executed the mortgage, he was under twenty-five years of age, but that the defendant was ignorant of the fact, until some time in 1804. That *Henry V. F.,* on the 25th of *July,* 1799, gave a sealed bill to *Adam Snell,* for the penal sum of 820 dollars, to secure the payment of 410 dollars, with a warrant of attorney, by virtue of which, a judgment was entered on the bill, in the Supreme Court, the 20th of *May,* 1799. That on the 4th of *September,* 1800, he purchased and took an assignment of the judgment from *Snell,* for 445 dollars and 52 cents, being the principal, interest, and costs, then due, which he paid. That he caused

the judgment to be revived in 1814, against the plaintiffs, as devisees of *Henry V. F.* That on the 17th of *May,* 1810, he sold and conveyed the reversion of 100 acres of land, comprised in the mortgage to *Yates,* for 214 dollars and 28 cents ; that on the 23d of *May,* 1811, he gratuitously conveyed the reversion of 300 acres in the same lot, No. 17, to the widow of *Henry V. F.,* for life. That in *March,* 1814, lot No. 2. in the *Royal Grant,* belonging to *Henry V.,* was seized and sold under an execution, issued on the judgment of *Snell,* and was struck off, at the sheriff's sale, to the defendant, as the highest bidder, for 853 dollars and 97 cents. That he sold the lot, on the same day, for 800 dollars. That the schedule *G.* annexed to his answer contained a true account of the sums received by him from the sales of parts of the premises, and of the rents in arrear, &c. That *M. B. Wimple,* about the 7th of *August,* 1807, recovered a judgment against the plaintiffs, *Jane* and *Jellis H. F.,* as heirs and devisees of *Henry V. F.,* for 321 dollars and 36 cents. That *Peter Putnam* also recovered a judgment against the same plaintiffs, as heirs and devisees of *H. V. F.,* on the 3d of *August,* 1807, for 265 dollars and 48 cents. That executions were issued on those judgments in 1807, by virtue of which the sheriff seized the *Caughnawaga* farm, (except the fifty acres sold to *Yates,*) containing 272 acres and an half ; and sold the same on the 28th of *October,* 1807, to the defendant, as the highest bidder, for 520 dollars, subject to all antecedent incumbrances. That the farm was then subject to the mortgage to *J. J. Beekman,* and the defendant, for 1,347 dollars, and to a judgment in favour of *John Davis,* for 250 dollars, and to the balance due on a judgment in favour of *Stevenson* and *Dowe,* of 135 dollars and 32 cents. That there was due on these three incumbrances, at the time the farm was sold, exclusive of the two executions, 2,937 dollars and 66 cents. The defendant alleged, that the purchase of the farm by him, at the sheriff's sale, was fair and *bona fide,* and that he had no interest in the

judgments. That he actually paid the amount of the pur-
chase money to the sheriff, and to *Wemple* and *Putnam*,
the balance of the executions. That at the time of the sale,
there were other debts of *Henry V. F.*, assigned to him, and
a promissory note of *H. V. F.*, for 100 dollars, for money
lent to him. That his object in purchasing the farm was to
secure the amount of his three *liens*, and of the debts
mentioned in a schedule annexed to his answer. That the
farm, at the time of the sheriff's sale, was not worth
more than 8,000 dollars; and that he has made improve-
ments since, to the amount of 2,500 dollars. He denied all
the charges of fraud or improper conduct in this transaction.
He stated, that his part of the mortgage debt of *Beekman's*
consisted in notes of *H. V. F.* to the amount of 380 pounds,
to secure which and the debt of *B.*, the mortgage was
given, and the notes then delivered up to *Henry V. F.*
He admitted the agreement with the widow of *Henry V. F.*
relative to the dower; and stated, that she mortgaged
the lands assigned to her for her dower to *A. Van Vech-
ten*, to secure 706 dollars and 14 cents, of which sum 556
dollars and 30 cents, belonged to the defendant, being mo-
ney lent to her second husband *W. H.*: that the defendant,
on the 17th of *September*, 1810, paid the sum due *Van
Vechten* and took an assignment of the mortgage; and in
*October*, 1810, *W. H.* and his wife released her right in the
mortgaged premises to the defendant, in payment of the
mortgage; and thus he acquired a legal and *bona fide*
title to the *Caughnawaga* farm; and he denied all manner
of fraud charged in the bill, as to his acquiring a title to that
farm. That the plaintiff, *A. Van Horne*, soon after his mar-
riage with the plaintiff *Jane*, took possession of four or five
acres of the premises, under some understanding that he
should take a lease from the defendant, which, however,
was not executed; and he was, afterwards, ejected by the
defendant. He admitted, that the widow of *Jellis F.*

1821.

VAN HORNE
v.
FONDA.

continued on the *Caughnawaga* farm until her death; that she made a will in *February*, 1803, the substance of which was stated by the defendant, and made *John Yates* and the defendant her executors. That an inventory was taken of her effects, and a division made thereof, according to the bequest in the will, &c., and copies of the inventory and division were set forth in a schedule annexed to the answer. That the defendant took nothing. That he took possession, as executor of *Jellis F.* of three negroes, and disposed of them, according to a schedule annexed. That no stock or utensils were left on the farm; that the widow, *Henry V. F.* and his widow took every thing. He gave an account, in schedules annexed to his answer, of the rents and profits of the real and personal estate of *Jellis F.*, and stated that he did not receive enough to pay the debts and legacies. He admitted that the plaintiffs, *Jane* and *Jellis H. F.*, were entitled to a moiety of the surplus, if any, of the real and personal estate of *Jellis F.* excepting such parts as had been sold by the trustees named in the will, for the payments of debts and legacies. He denied, that he unfairly or fraudulently misapplied, or converted to his own use, any part of the estate. He stated various gratuitous expenses incurred by him in the education and maintenance of the plaintiffs, *Jane* and *Jellis H. F.*, which he alleged amounted to above 2,000 dollars.

A general replication was filed, and above forty witnesses were examined, and various documents and papers exhibited by the parties, respectively.

*April* 12th, 1821. The cause was brought to a hearing this day.

*Henry* for the plaintiffs. He made the following points:

1. That the defendant fraudulently prevented the persons nominated as executors with him by the will of *Henry V. Fonda*, deceased, from undertaking the executorship; and, afterwards, by intermeddling with the personal estate became executor *de son tort*.

2. That the deed of the 3d of May, 1794, from *Henry V. Fonda*, and *Catlina* his wife, to the defendant, of *Brant Johnson's* 1000 acres, was not an absolute conveyance, but was intended to vest the title in the defendant, to enable him to make a compromise with the people of this State.

3. That the conveyance of the 24th of *April*, 1794, from the defendant to *Henry V. Fonda*, was not the consideration for the last mentioned deed.

4. That the defendant, either as the fellow tenant of *Henry V. Fonda*, or as an executor of the will of *Jellis Fonda*, is bound to account for half of the moneys received by him from the State, in extinguishment of the title to 2,000 acres of land in the royal grant, devised by Sir *William Johnson* to *Brant Johnson* and *William Johnson*, with interest, after deducting the sum of 620 dollars, paid by the defendant for the adverse claim of *Moses Johnson*, as the heir of *William Johnson.*

5. That if the defendant is not bound to account for the one half of such moneys, he is bound, as fellow tenant of *Henry V. Fonda*, and executor of *Jellis Fonda*, to account for one half of what was received for *William Johnson's* 1000 acres, after deducting what was paid for the adverse claim, with interest.

6. That the plaintiffs are entitled to redeem the lands and tenements mortgaged by *Henry V. Fonda* and wife to *Joseph Yates ;* and that for that purpose, an account should be decreed between the defendant and the plaintiff; crediting whatever may have been unpaid upon the mortgage of principal or interest, and charging the defendant, with all rents reserved, or moneys which may have been in any wise received, or might have been recovered from the mortgaged premises, or any part thereof, with interest thereon ; and also, for all moneys received on actual *sales* and conveyances, of any parts of the mortgaged premises; and that any parts of the same remaining unsold, be con-

veyed by him to the plaintiffs, *Jane* and *Jellis*, free from all incumbrances.

7. That the sale of lot No. 2. in the royal grant, under the judgment in favour of *Adam Snell*, revived by the defendant, was fraudulent; and, therefore, the defendant should be decreed to account for the price at which the same was sold, with interest.

8. That the mortgage of the 10th of *January*, 1799, from *Henry V. Fonda* to *John Jacob Beekman*, and the defendant, as to the debt of 380*l.* pretended to be secured thereby to the defendant, was and is, set up and kept on foot, fraudulently, and ought, therefore to be so far disallowed; but, if taken into account, it should only be as to sums actually proved to have been paid.

9. That the sale of the *Caughnawaga* farm, was fraudulent and void, or purchased by the defendant in his character of executor *de son tort* of *Henry V. Fonda*, deceased; and that the defendant should be decreed to convey the same to the plaintiffs, *Jane* and *Jellis*, free from all incumbrances, after an account, charging him with rents and profits, and crediting him with actual expenditures for repairs only, and with any debts actually due to him from *Henry V. Fonda*, and any moneys actually paid by him for, or in the purhase of debts, really due by the said *Henry V. Fonda*, and with the value of the dower of the widow of *Henry V. Fonda* in the said farm, not, however, exceeding the sum paid by the defendant upon the conveyance to him, by her and her husband.

10. That the defendant should be decreed to account with the plaintiffs relative to the real and personal estates of *Henry V. Fonda*, deceased, and of *Jellis Fonda*, deceased, and of *Jannetje Fonda*, deceased, and for this purpose, to make a full disclosure of the real estates of the said *Jellis Fonda* and *Henry V. Fonda*, and to produce on oath, all papers, &c. in his power or custody, relating to either of such real or personal estates.

11. That if any allowance ought to be made, for the alleged support and education of the complainants, *Jane* and *Jellis*, it should be only for his actual expenditures, to be proved.

12. That the answer of the defendant is, in various important particulars, disproved, and utterly discredited, and, therefore, as to all affirmative matters, and all matters of avoidance, or discharge, stated or insisted upon, as a defence, should be disregarded, and proof thereof required, where such matters are competent as a defence.

*Van Vechten,* for the defendant, stated the following points:
1. That the defendant has not intermeddled with the estate of *Henry V. F.,* deceased, so as to become executor *de son tort.*

2. That the deed of the 3d of *May,* 1794, from *Henry V. Fonda* and wife, to the defendant, was absolute, and in consideration of the defendant's conveyance to *Henry V. F.,* of the 24th of *April,* 1794.

3. That the deed being absolute on its face, and for a valuable consideration, therein expressed, parol evidence in contradiction thereto is inadmissible.

4. That the defendant is not accountable for any portion of the moneys received from the State, for extinguishing his title to the lands in the *Royal Grant,* because the one thousand acres, devised by Sir *William Johnson* to *Brant Johnson,* were absolutely released to the defendant, by *Henry V. F.,* by the deed of the 3d of *May,* 1794; and the other one thousand acres were his own purchase, &c.

5. That the defendant is ready to account for such parts of the lands mortgaged by *Henry V. F.* to *Joseph Yates,* as he has sold, and for the rents and money received by him, deducting, however, the fifty acres released by *Henry V. F.* and wife to *Flint,* and the rents of the premises conveyed in trust by the defendant to the plaintiff *A. A. Van Horne,* for the use of his mother-in-law, *Henry's* widow, during life, and the premises conveyed to Dr. *Sherwood,* in satisfaction of his

demand, for the board and education, &c. of the plaintiff, *Jellis H. Fonda;* and the defendant is also ready to convey the residue of said mortgaged premises to the plaintiffs, *Jane* and *Jellis*, on being paid what shall be ascertained, by a master, to be justly due him for *bona fide* debts owing to him from the estate of *Henry V. F.*, or for moneys paid out by the defendant, with which the said estate is justly chargeable.

6. That the mortgage of the 10th of *January*, 1799, to the defendant and *John Jacob Beekman*, is valid, for the amount therein expressed, with lawful interest, and remains unsatisfied.

7. That the purchase of the *Caughnawaga* farm was not fraudulent in point of fact; nor made by the defendant as executor, *de son tort*, of *Henry V. Fonda;* but if set aside, an account should be stated by a master, charging the defendant with the fair yearly value thereof, exclusive of the part set off for the widow's dower, (the fifty acres bought by *Evert Yates* from the loan officers, under *Henry V. F.'s* mortgage,) and the parcels conveyed by *Henry V. F.* to the *Caughnawaga* Church, and to settlers in the village of *Caughnawaga*, and crediting the defendant with actual expenditures for repairs, and permanent and beneficial improvements, and all sums justly due him from *Henry V. F.*, either for debts, or for moneys paid by him, for, or in purchase of debts owing by the said *Henry V. F.*, and also the one half of all *bona fide* advances made by the defendant, on account of the estate of *Jellis Fonda*, deceased, for debts, or for which the defendant is responsible, beyond the assets received by him as executor, or the value of the residuary real estate of the said *Jellis Fonda.*

8. That the defendant is ready to account, relative to any real or personal estate of *Henry V. Fonda*, (if any) for which this Court shall consider him accountable; and also of the

said *Jellis Fonda*, and to make any disclosures which may be in his power, and this Court shall direct.

9. That an allowance should be made to the defendant, for the support and education of the plaintiffs *Jane* and *Jellis*, and for the fair value of all advances made by him, to, or for them, or either of them.

THE CHANCELLOR. The bill seeks to call the defendant to an account, as executor of the estate of *Jellis Fonda* deceased, and, also, as executor of the estate of *Henry V. Fonda* deceased, and, generally, to make him account as trustee, acting for and on behalf of the plaintiffs, in the management and disposition of the estate, real and personal, of *Henry V. Fonda*.

The defendant admits himself to have been the acting executor of the estate of his father, *Jellis F.* and is ready to account for the personal estate, and the rents and profits of the real estate which he may have received. The great contest in the case is as to the character in which he acted, and the responsibilities which he has incurred, in respect to the estate, real and personal, of his brother *Henry V. F.*

1. He is charged with acting as executor of *Henry*, and that charge he denies. But it appears to be sufficiently supported by the testimony. One witness, *Peter Fonda*, says, that he took possession and disposed of a great part of the personal estate of *Henry V. F.* and offered to sell to the witness several articles of farming utensils on the farm of *Henry V. F.* and the witness purchased a wood sleigh, and paid the defendant the price of it. So, it is in proof that he paid a debt due from *Henry V. F.*, at his death, to *John M'Carthy*, and another debt due from *Henry V. F.* to *Marks Dockstader;* and in the last case, the debt was frequently demanded of him, and he was threatened to be sued for it. He received payment of a debt due from *S. Kittle* to *Henry V. F.;* and, in another case, he demanded,

An executor named in a will, and who never qualified as such but who took possession of some part of the personal property of the testator, and paid some of his debts; was held by these acts, to have elected to act as an executor, and was chargeable as executor.

1821.

VAN HORNE
v.
FONDA.

and received payment, of a debt due from *M. B. Wemple* to *Henry V. F.* These multiplied acts are decisive proof of his election to assume the trust and act as executor. They would have made him an executor *de son tort*, if he had not been named an executor in the will, and the same acts amount to an assumption of the office of a rightful executor.

I shall, therefore, consider all his acts, in relation to the estate of *Henry V. F.* as the acts of a person who was at the same time clothed with the office of executor.

2. The bill charges that the defendant received, in *March*, 1799, from the government of this State, 6,500 dollars, as a *compensation* for the extinguishment of the right derived from *Jellis F.* to 2000 acres of land in the *Royal Grant*, and that the plaintiffs are entitled to a moiety of that sum, with interest. The defendant admits that the sum received was 6,250 dollars, but he claims title to the whole of it; and contends, in the first place, that his father, *Jellis F.* was only entitled, in his life time, to 1000 acres, inasmuch as *Brant Johnson*, who sold him the 2000 acres, owned only a moiety of it, and that the other moiety belonged to *William Johnson*, a brother of *B. Johnson*. He contends, in the second place, that his brother *Henry*, by his deed of the 3d of *May*, 1794, conveyed to him in fee, and absolutely, without any reservation or trust, his interest in the 1000 acres, for the consideration of 100 pounds, and which consideration was paid by a deed from the defendant to *Henry*, of the date of the 24th of *April*, 1794, of two lots in the *Royal Grant*, and containing the like consideration.

It is to be observed, as we proceed, that the defendant, and his brother *Henry* were joint and equal residuary devisees of their father, *Jellis Fonda*.

There is reason to believe that the deed of the 24th of *April*, was not given as the consideration of the deed of the 3d of *May* following. The want of concurrence in dates

raises that presumption, especially as that want of concur-rence is left without any explanation. In the next place, it is in proof, by the testimony of *Simon Veeder*, who took the acknowledgment of the deed of the 3d of *May*, and de-livered the deed over to the defendant on the same day, that *Henry* observed, at the time, that *the deed to Jellis F. his father, was deficient.* The certificate of acknowledgment bears date the 31st day of *May*, 1794, but the certificate of acknowledgment of the prior deed of the 24th of *April*, bears date the 2d day of *August*, 1794, and both the ac-knowledgments were made before the same judge. The de-fendant was present when the acknowledgment of the deed of the 3d of *May* was taken ; and when the deed was hand-ed to him, he observed that the consideration mentioned in the deed *was not the value* of the property, *but he took the deed in order to save something for the children of his bro-ther, as his brother was pretty much involved in trouble.*

These observations of the parties made at the time of the execution of the deed, are evidence that the deed was not taken as an absolute purchase of the right of *Henry* to the 1000 acres; and they are evidence that it was taken *in trust,* and, probably, with a view to facilitate a compromise with the State, according to the charge in the bill. The testimony of *Evert Yates,* and *James Lansing* shows that the deed of the 3d of *May* was not considered by the defendant as an absolute purchase of the right of *Henry,* and paid for, by the prior deed of the 24th of *April.* When the executors of *Henry* met, soon after his death, the de-fendant told *John Fonda,* who asserted *Henry's* interest in the money received upon the compromise, that *Henry* had no such interest, for his father's title was incomplete, and he had since purchased up the Indian title of *William John-son,* and considered it a speculation of his own. Here was no suggestion that he had actually bought in the right

1821.

VAN HORNE
v.
FONDA.

of *Henry*, a reply that would naturally have suggested itself, if such had been the fact.

It is also admitted, by the answer, that the title of *Jellis F.* to the 2000 acres, had been conveyed by him, in his life time, to *Abraham G. Lansing ;* and that as the title proved partly defective, the defendant and his brother *Henry*, as the representatives of their father, had conveyed to *Lansing*, in 1793, other lands to the amount of 2650 acres, derived to them from their father, in lieu of the two thousand acres ; and that *Lansing* had then released his right to the 2000 acres, to the defendant and *Henry*. The 2000 acres were thus received back into the funds of the estate, as a substitute for the 2650 acres which had been transferred ; and the two brothers became equally entitled, as tenants in common and residuary devisees of *Jellis F.*, to all the right and interest, in law and equity, of their ancestor to the 2000 acres. The defendant, afterwards, on the 29th of *May*, 1795, purchased of *Moses Johnson*, the heir of *William Johnson*, for 600 dollars, his right and title to 1000 acres, being part and parcel of the 2000 acres originally purchased by *Jellis F.* from *Brant Johnson*. The question, then is, whether the defendant did not make that purchase for the joint benefit of himself and his brother *Henry*. If the deed of the 3d *May* 1794, was given to the defendant, in trust for the purpose of facilitating the acquisition of a good title, then the purchase from *Moses Johnson*, was in trust for their joint benefit. The defendant has not interposed and pleaded the statute of frauds against setting up a trust by parol, in opposition to the deed of the 3d of *May*, 1794 ; and we are left at liberty to judge of the truth and effect of the parol proof. I am strongly inclined to believe, that the deed was taken in trust, and that the subsequent purchase from *Moses Johnson* was made in trust, and that *Henry* was equally interested in the settlement made with the State, in *March* 1799 ; and that his representatives are entitled

to a moiety of the payment received from the State, (which payment amounted to 6,500) after allowing to the defendant, the payment he made to *Moses J.* and a just indemnity for his expenses in procuring the satisfaction from the State.

In some cases, says *Littleton*, (sec. 307) a release to one joint tenant shall aid the joint tenant to whom it was not made, as well as him to whom it was made. I will not say, however, that one tenant in common may not, in any case, purchase in an outstanding title for his exclusive benefit. But when two devisees are in possession, under an imperfect title, derived from their common ancestor, there would seem, naturally and equitably, to arise an obligation between them, resulting from their joint claim and community of interests, that one of them should not affect the claim, to the prejudice of the other. It is like an expense laid out upon a common subject, by one of the owners, in which case all are entitled to the common benefit, on bearing a due proportion of the expense. It is not consistent with good faith, nor with the duty which the connexion of the parties, as claimants of a common subject, created, that one of them should be able, without the consent of the other, to buy in an outstanding title, and appropriate the whole subject to himself, and thus undermine, and oust his companion. It would be repugnant to a sense of refined and accurate justice. It would be immoral, because it would be against the reciprocal obligation to do nothing to the prejudice of each other's equal claim, which the relationship of the parties, as joint devisees created. Community of interest, produces a community of duty, and there is no real difference, on the ground of policy and justice, whether one co-tenant buys up an outstanding incumbrance, or an adverse title, to disseize and expel his co-tenant. It cannot be tolerated, when applied to a common subject, in which the parties had equal concern, and which created a mutual obligation, to deal can-

Admitting that one tenant in common may, in some cases, purchase in an outstanding title, for his own benefit; yet where two devisees are in possession of land, under an imperfect title, devised to them, by their common ancestor, one of them cannot buy in an outstanding debt, so as to *title* disseise or oust his co-tenant; but such purchase will enure to their common benefit, subject to an equal contribution to the expense.

didly and benevolently with each other, and to cause no harm to their joint interest. I have no doubt, therefore, that in a case like the present, and assuming what the evidence warrants us to assume, that the deed of *May*, 1794, was taken by the defendant for trust purposes, that the purchase from *Moses Johnson* ought, in equity, to enure for the common benefit, subject to an equal contribution to the expense.

3. The plaintiffs are entitled to redeem the lands mortgaged by *Henry F. Fonda* to *Joseph Yates*, and to make the defendant account for the proceeds of such parts of those lands as have been sold by the defendant, (which sale the plaintiffs are willing to confirm) and for the rents and profits which have been received, subject to whatever payments have been actually made by the defendant upon that mortgage. The lands included in the mortgage, purchased in by the defendant, and remaining unsold, ought to be conveyed to the plaintiffs, free from incumbrances.

The defendant admits, that he purchased and took an assignment of this mortgage, on the 4th of *February*, 1800, and proceeded to advertise and sell the mortgaged premises, under a power contained in the mortgage, in *August*, 1800, and that he became the purchaser himself. The defendant, in his answer, denies that he ever said, or admitted, that he bought in and held the mortgaged premises for the benefit of the plaintiffs, but alleges that he meant to reimburse himself for the mortgage debt, and then pay the debts still owing by the estate of *Jellis Fonda*, deceased, and then appropriate the surplus, "according to his own discretion," to assist the plaintiffs and their mother. He admits, however, that the sale under the power was void, owing to the minority of *Henry V. F.* when he gave the power; and in his letter to *W. Hammond,* of the 1st of *May*, 1804, he says, that he *always intended* to account for the mortgage to the heirs, or executors, of his brother. Whatever his

intentions on this subject might have been, (for the answer and this letter do not entirely agree,) yet the purchase under the sale, was in judgment of law, in trust for the plaintiffs. Being executor of *Henry V. F.*, he had no right or power, to extinguish the mortgage, or other debts, for his own benefit, or to traffick with the estate for his own emolument. If a trustee or executor compound debts or mortgages, or buy in for less than is due, he shall not take the benefit of it to himself, for when he takes a trust, he is to take it for the benefit of the *cestui que trust.* He cannot be permitted to raise in himself, an interest opposite to that of the party for whom he acts. This is a fundamental doctrine in equity. (2 *Fonb.* b. 2. c. 7. sec. 7.) The haste with which that purchase of the mortgage was made, and the sale under the power effected subsequent to his brother's death, affords a very unfavourable specimen of the spirit with which he dealt with his brother's estate.

The defendant says, in his answer, that he purchased up a judgment of *Adam Snell* against *Henry V. F.*, on the 4th of *September*, 1800; that he revived the judgment in 1814, against the plaintiffs, and sold a lot of 100 acres in the *Royal Grant* covered by *Yates's* mortgage, for 853 dollars and 97 cents, and purchased it in himself. He purchased in the judgment in 1800, for 445 dollars and 37 cents.

Here was also a breach of trust; for an executor is not permitted to buy in a debt, and then, afterwards, make that debt the means to sell, and buy in the property for his own benefit. The defendant can only be allowed, in his account, for the payment of whatever was justly due to *Snell*, when he took the assignment of his judgment in 1800, and he must account for the price for which the lot was sold under his judgment, with interest. The judgment of *Snell* was satisfied, by his purchase of it, as executor, in 1800.

4. Another charge in the bill, is, that the defendant, in

*In margin:*

1821.

Van Horne v. Fonda.

An executor or trustee cannot buy in a mortgage, judgments, or other debts of the testator, or *cestui que trust,* for his own benefit; nor can he deal or traffic with the estate for his own emolument.

*October*, 1807, fraudulently sold, and purchased in, on his own account, a farm of 300 acres and upwards, at *Caughnawaga*, belonging to the plaintiffs, as children of *Henry V. F.* It is charged, that the defendant sold, under two small judgments, which had been obtained against the plaintiffs, as heirs and devisees of *Henry V. F.*, and which judgments he then claimed by assignment, one entire farm, worth, at the time of the sale, upwards of 10,000 dollars; and that the circumstances attending the sale denote premeditated fraud. This is the gravest charge in the bill, and one that is most satisfactorily supported.

The answer admits the existence of a judgment of *M. B. Wemple*, of the 7th of *August*, 1807, for 321 dollars and 36 cents, and another judgment of *Peter Putnam*, of the 3d of *August*, 1807, for 265 dollars and 48 cents, and that the farm of 272, 1-2 acres, was sold, by executions on those judgments, on the 28th of *October*, 1807, and purchased by the defendant, for 520 dollars; and he says, that he purchased fairly, on his own account, and without any trust in favour of the plaintiffs, and denies, that he had any interest in those judgments, or any control over the executions. He says, that the farm was, at the time, subject to a mortgage to *John J. Beekman* and himself, of the 10th of *January*, 1799, for 1,347 dollars, and to a judgment in favour of *John Davis*, for 250 dollars, and to the balance of a judgment in favour of *Stevenson* and *Douw*, for 135 dollars and 32 cents. These two latter judgments, he says, had been assigned to him, in *September* and *November*, 1799, and that there was due, at the time of the sale, on those three incumbrances, 2,937 dollars and 66 cents. He says, further, that he then owned *Beekman's* interest in the mortgage, in right of his wife, and that he purchased to secure his three incumbrances, and some other debts of his brother *Henry*, which had been assigned to him.

It is abundantly in proof, that the farm was worth about 10,500 dollars, at the time of the sale; and that from two

to eight or ten acres from the east side of it, would, upon a sale have satisfied the two executions. Let us now see how far this answer is contradicted by the proof.

The defendant, at the time of the sale, did own the judgment and execution of *Wemple.* It is proved by *Wemple* himself, that the defendant sent proposals, before the sale, to him, to buy his judgment, and take an assignment of it, and he said, he *intended to use it for the benefit of the plaintiffs.* *W.* went to the house of the defendant, and agreed to sell and assign the judgment to him, who paid for it, 247 dollars and 71 cents. He then agreed to meet the defendant, near the place of sale, the evening before, to execute the assignment, and the defendant requested the witness to keep the meeting a SECRET, for fear the neighbours would get the land from him, *and the children would not be able to have it.* They met, accordingly, at the place appointed, and the witness executed the assignment, and when the defendant took it, he said, *he took it for the purpose of purchasing the lands for the benefit of the plaintiffs, the children of Henry.* The day after the sale, he told the witness, he had purchased the farm *for the children.* It is further proved, by *James M'Intyre,* the sheriff, that on the day of the sale, he received the assignment of *Wemple's* judgment, in satisfaction of the execution; that the assignment had been executed before the day of sale, and he received it, either from the defendant, or from *D. Cady,* the attorney to the execution.

Here, then, the answer is falsified in one essential point. It is also contradicted by the proof, in respect to the circumstances of the sale, and the declared purposes under which the defendant became the purchaser. We have already observed, that he frequently declared to *Wemple,* that he took the assignment of his judgment, and made the purchase, for the benefit of the children.

The defendant, before the sale, declared to *Abraham Van Horne,* that he would *be a father to the plaintiffs, and take*

*care of their property.* This led that witness to infer, that he would purchase in the farm for their benefit. He said to *Jacob Van Alstyne,* on the day of sale, that he gave for the farm 520 dollars, and *should not have got it so, but he bought for the children,* and that he told those who attended the sale, that he *intended to purchase, for the benefit of the children of Henry.* *Daniel Cady* was the attorney to the two executions, and he attended the sale, and bid up to the amount of them ; he heard nothing about incumbrances, and was informed that the defendant had the charge of the plaintiffs, and was, in some measure, providing for them ; he says, that if he had not supposed *that,* he never would have suffered the farm to have been struck off for the amount of the executions. *M‘Intyre,* the sheriff, testifies, that at the sale, one *Rust* was present, and bid once or twice, and then asked, if the property was to be bidden off for the benefit of the children of *Henry,* and that either the defendant, or the witness replied, that *it was,* and *Rust* then desisted from bidding. If the witness so replied, it was from express information received from the defendant ; for, before the day of sale, and on the morning of the day of sale, the defendant told the witness, that he intended to purchase in the premises for the benefit of the children of *Henry.* He says, that the farm was not declared to be sold, subject to any incumbrances. It appears, also, by the testimony of *Peter Putnam,* that on, and after the day of sale, the defendant declared, that *he meant the farm for the children.* The defendant made the same declaration to *Evert Yates,* and observed, that he had *purchased the farm for the benefit of the children,* and that they should have it, upon paying him back his money, with interest ; and it was for that reason that the witness sold him thirty acres adjoining the farm so purchased, and which thirty acres had been detached from the farm, by means of a sale under a loan office mortgage.

These witnesses prove the answer to be false, in respec

to the avowed character in which the purchase was made, and the alleged fairness of the sale. It is satisfactorily shown, that the defendant did assume to buy, in the character of trustee, for the plaintiffs, who were then infants, (the one being fifteen and the other twelve years of age,) and did, by that means, stifle competition, and was enabled to buy in the estate, for a comparatively nominal sum. To appropriate the whole purchase afterwards to himself, as a speculation, was a gross breach of his duty, as a trustee. It necessarily follows, that he is answerable for that purchase, in the character which he had assumed; and considering that he was the owner, at the time, of one of the judgments, and had the control of one of the executions, and that a large and valuable farm was sacrificed under false pretences, when only a very inconsiderable part of it would have satisfied the executions, we are required, by the most obvious principles of justice, to make the defendant account for that pur-. chase. And it is worthy of notice, that the defendant admits, in his answer, that he visited his brother a few weeks before his death, and that the latter expressed great solicitude about his children, when the defendant voluntarily told him, *he would take care of his children.* He thus stood, in all his subsequent transactions, *in loco parentis*, and was under the most sacred obligations, to execute the trust with parental fidelity.

5. The defendant sets up, as a debt against the estate, a mortgage executed by *H. V. F.* to *J. J. Beekman* and himself, on the 10th of *January*, 1799, on the *Caughnawaga* farm, to secure the payment of 157*l.* to *Beekman*, with interest from the 21st of *June*, 1797, and of 380*l.* to the defendant, with interest from the date. This mortgage debt was one of the incumbrances upon the farm, which the defendant says induced him to make the purchase; and he says, the mortgage debt to him was founded upon notes to that amount, which he previously held against *Henry*, and which notes were then delivered up.

**1821.**

VAN HORNE
v.
FONDA.

There is reason to believe, that this mortgage debt had been satisfied even prior to the death of *Henry ;* or that it was originally created either by imposition, or upon some secret trust not disclosed, or to meet future responsibilities not incurred.

When the defendant met with the other executors of *Henry,* shortly after his death, he exhibited a statement of the debts due from the estate of *Henry ;* and he admits that it was a statement of debts owing by *Henry,* "as far as the same had then been ascertained." In that statement, he entirely omits his demand under that mortgage, and there is no accounting for the omission. He mentioned the debt due under that mortgage to *Beekman,* amounting, as he stated, to 160*l.,* and his attention, therefore, must have been directed to that very mortgage. One of the witnesses who was present when the statement was produced, (*James Lansing,*) said, that the defendant was asked, if he had any claim, and he replied, that *was a matter of no consequence.* There is another document in proof, still more decisive; and that is the *book of accounts* of *Henry V. F.,* containing entries in it, admitted to be in the handwriting of the defendant. In one place, the defendant writes against an account of *Henry* against him, " By cash in full, *September* 1st, 1796?" and in another place, on the credit side, *by your note of* 1st and 2d *September,* 60*l.* And this credit is given as of the date of *June* 21, 1797. And in another place, of the date of *April* 13th, 1799, the defendant adds, " *by a settlement made, and I am due on this account to my brother a balance of* 41*l.* 19*s.* 1*d.* *To my note for the above, in full,* 40*l.*" And then he adds below, " To an abatement,  . . . . . £1  10  0

" To balance short,  . . . . .  0  9  1

                                            ———————————
                                            £41  19  1"

Could the mortgage debt be subsisting, after this settlement? Can this note of 40*l.,* which he thus applied, only thirteen days before his brother's death, as a set-off, be the

100 dollars, which he says he lent to his brother a few days before his death? Can that 100 dollars be still a subsisting debt?

These entries, in his own hand, and the omission of either of those debts in the statement, are sufficient to put him upon the proof of any debt originally due to him, under that mortgage, or otherwise. The defendant ought, therefore, not to be allowed, in accounting before the master, for the mortgage debt of 380*l.*, *on the foot of the mortgage*, and he ought not to be allowed any part of that debt, or any other debt of his own, against the estate of *Henry*, without satisfactory proof of its subsisting, at the death of *Henry*. He ought, also, to be decreed to convey the *Caughnawaga* farm to the plaintiffs, free from incumbrances, and he ought to be charged with the rents and profits, and credited with expenditures for actual repairs, and with moneys actually paid by him for, and in the purchase of debts really due by *Henry*, and also with the value of the dower of the widow of *Henry* in the farm, not, however, exceeding the sum paid by the defendant, upon the conveyance to him, by her and her husband. The defendant ought not to be absolutely precluded from showing the existence of any debt due from *Henry* to him, provided, he can prove it to entire satisfaction, independent of the mortgage, or note, which he might produce. He ought to be put to show the circumstances, and how it arose, and when; and to reconcile its existence with the entries made by him in his brother's book. " A bond or mortgage," says Lord *Talbot*, in *Pıddock* v. *Brown*, (3 *P. Wms.* 289.) " is, *prima facie*, good evidence of a debt. But, whenever there are manifest signs of fraud in the obligee, he ought to be put to the proof of actual payment; and though he may happen thereby to lose some part of the money really due to him, for want of being able to make sufficient proof, this is but a just punishment of him for the fraud."

Nor do I think that the defendant ought to be allowed,

VAN HORNE
v.
FONDA.

under the circumstances of this case, for what might, other-wise, be deemed beneficial improvements made by him on the *Caughnawaga* farm. He entered in his own wrong, and held under a claim of title, procured by fraud, and he is not entitled beyond the amount of his actual expenditures. Every thing beyond that was gratuitous. A fraudulent possessor is never allowed for beneficial improvements. (2 *Johns. Ch. Rep.* 602.)

The defendant ought, in addition to the *items* already noticed, to be directed to account, generally, relative to the real and personal estates of *Jellis F.* and of *Henry V. F.*, deceased, and also of *Jannetje*, the widow of *Jellis F.* He ought also to be examined, if required, upon oath, and to produce all papers, in his custody or power, relative to those estates ; and to be allowed for actual expenditures, for board, clothing, and education of the plaintiffs, or either of them ; but all affirmative matters stated in the answer, and all matters set up by way of avoidance, or discharge, and which are competent, as a defence, must be satisfactorily proved. I shall direct a reference to a master, to take and state an account, upon the principles, and under the directions already declared.

                         Decree accordingly.