1. EXECUTORS—ACCOUNTING.
　　Profits made by the executor in speculating in claims against the estate must be charged up against him on an accounting.

2. SAME—PROFITS FROM ESTATE.
　　Where the executor of an estate procured assignments of the claims to be made for less than their face value, using moneys of the estate for that purpose, and afterwards charging them in his account as paid in full, he will be surcharged with the profits made.

3. SAME—BURDEN OF PROOF.
　　The burden is on an executor who has employed his own son to collect claims to prove that the services and disbursements of the collector were reasonable and were rendered.

¶ 1. See Executors and Administrators, vol. 22, Cent. Dig. §§ 761, 1015.

4. SAME—COMMISSIONS.
    Where an executor used the funds of the estate to speculate in claims
against the estate, he will be denied commissions, and will be charged
with all costs of an accounting.

In the matter of the estate of Richard Rainforth. Proceedings on judicial settlement of the accounts of executor. Objections to account sustained.

Hoffman & Wahle, for executors.
Edward Farnham Todd (Frank Walling, of counsel), for contestant.

THOMAS, S. The testator died July 21, 1897. Letters testamentary were issued to two executors on September 18, 1897. On September 16, 1899, an intermediate account was filed by the executor now accounting, who has always had exclusive charge of the estate, and proceedings were taken for its judicial settlement. Objections were filed, a trial was had before a referee, and that contest was ended by an amended decree, dated October 24, 1901. Subsequent to that decree an application was made by the contestant for leave to file further objections to certain disbursements set forth in the said intermediate account, because of the recent discovery by the contestant of evidence, not available on the previous trial, tending to show that the executor was personally interested in the purchase of claims at a discount, which he paid in full. These items had not been litigated. The order then made permitted further objections to be filed, but reserved their trial until a later accounting. The present proceeding is for the judicial settlement of an account filed by the executor on March 1, 1901. The objections filed attack some items in the previous intermediate account interposed under the order already referred to, and also other items appearing in the final account. A trial has been had before a referee, to whose report exceptions have been filed. The present application is based upon these exceptions.

The referee correctly determined that all matters included in the intermediate account and litigated before the referee in that proceeding were conclusively settled and determined by the decree of October 24, 1901. This excluded from his consideration the items of wages paid by the executor to his son, as his bookkeeper or collector, during the period covered by the intermediate account. The objections touching the items in the intermediate account properly before the referee were those to the payment of assigned claims, which have already been referred to, and evidence as to them was taken before him. His disposition of those objections will first be considered.

Certain claims against the estate of the decedent were assigned by their owners to one Gustav Hellrung, by written assignments, at a uniform discount of 25 per cent. from their face, and were paid in full and with interest by the executor. It is claimed that the executor should be charged with the amounts of profit realized from these transactions. These claims were as follows: Koken Barber Supply Company, purchased for $1,705, and paid at $2,016; Doppler & Harris, purchased for $298.07, and paid at $419.65; B. & I. Eschmann,

purchased for $255, and paid at $361.45; I. Lewis & Sons, purchased for $397.56, and paid at $536.28.

As to the Eschmann claim, the referee reports that the objection is sustained, and surcharges the executor's account with $106.45, and to this the executor does not except. The date of the assignment of this claim is October 12, 1897, and the amount then owing them is recited in the assignment to be $314.50. Seventy-five per cent. of that sum is $255.10, and a check of the executor for that amount was paid by the Mutual Bank on October 18, 1897.

As to the Lewis claim, the evidence requires a finding that the claim was paid in full, and no exception is taken to the disallowance of the objection thereto. The referee finds that the objections as to the other claims, to wit, those of Koken Barber Supply Company and Doppler & Harris, were not sustained, and his conclusion is excepted to.

All of the active negotiations for the purchase of these claims were had by the executor personally, or by his son, who was employed by him as executor. The Koken Barber Supply Company was located at St. Louis, and the arrangement for sale of the claim was made, in part, at least, by correspondence with the executor. A final letter from its secretary to the executor, dated December 23, 1897, thanks him for his kindness in the matter, and notifies him that the assignment and other papers had been sent, with a draft on his son for $1,705, to the National Park Bank, and would be delivered on payment of draft. This draft was paid by the son about December 27, 1897. At that time the executor had three bank accounts—one as executor in the Continental Trust Company, one as executor in the Mutual Bank, and one as an individual, upon which either he or his son of the same name could draw, in the West Side Bank. At that date he had, as shown by his account, in his hands as executor, a sufficient balance to make this payment from the funds of the estate. His balance as executor in the Continental Trust Company on December 27, 1897, was $1,400. On December 28th a check drawn by him for $1,335 was paid. No disbursement shown on his account or suggested by him will explain this $1,335 check, and the strong inference is that this sum of $1,335 went towards the payment of the Koken Company draft. A receipt for the payment of $2,016.30 on this claim, signed by Gustav Hellrung, dated August 2, 1898, is submitted. Payments to other creditors are further fortified by canceled checks, but no such check accompanies this voucher, and the transcripts of the bank accounts of the executor do not disclose any such check.

The claim of Doppler & Harris was assigned to Gustav Hellrung by assignment, dated October 4, 1897, drawn in the handwriting and witnessed by the executor's son, and in it the amount of the claim is said to be $397.43. It is in proof that 75 per cent. of this, or $298.07, was paid by the executor to Mr. Harris on that day; and the account of the Mutual Bank shows that the check of the executor on his account in that bank, as executor, for precisely that amount, was paid on that day. The receipt of Gustav Hellrung for $419.50 on this claim is not fortified by any check, and no record of such check, if any was issued, is in evidence.

These facts establish, prima facie, that these claims were purchased with the funds of the estate, and suggest the inference that the assignments were mere covers and blinds, behind which the executor could take the profits of the transactions for his own benefit. The testimony of the executor and of Hellrung is to the effect that the money was actually advanced by Hellrung, and that the money so advanced, or a part of it, was first deposited to the credit of the executor as such, and then withdrawn to pay for the assignments. This does not impress my mind as a probable story. The obvious purpose of depositing trust funds in an account which shall stamp upon them their trust character is to mark their true ownership. That an executor meditating a use of cash in his hands which would be lawful if it was not assets of the estate, and which would plainly be fraudulent if it was such assets, should deliberately put the trust label upon it only a few days before carrying out his plan, is incredible. Not only does the account given by the executor fail to satisfy me of its inherent probability, but it impresses me that he was not trying to tell the truth, and some of the facts lead me to conclude that he is not a credible witness. He stated, for instance, in the early part of his examination, that the discount on the claims was 15 per cent., when the clear proof and his own subsequent admission is that it was 25 per cent. in each case. In at least one instance, established so clearly by proof that the referee's finding convicting him is not excepted to, the executor did, in relation to the assignment of another claim to Mr. Hellrung, just what he is here charged with. His account also contains an utterly false and fictitious charge for notary's fees not paid, and not shown to have been earned, but fortified by oaths and vouchers, which was not abandoned until the proof against him was overwhelming. He took a voucher from the undertaker for burying his testator for $178.50, and asked and obtained allowance of it at that sum, though all he paid was $140. When pressed to proceed before the referee, and seeking for delay, he walked to his physician's office and induced him to write, in his presence, an affidavit to the effect that he was then "ill in bed." He had the physician go to his own place of business and swear to this false statement as true, and he then procured it to be submitted to the referee as a basis of judicial action. The uncorroborated testimony of such a witness, given in his own interest, is not entitled to absolute credence. Mr. Hellrung is, on the clearest evidence, and on the finding of the referee not excepted to, guilty of making at least one false voucher, and of attempting to aid in diverting a part of this estate from the parties entitled, by misrepresentation of facts. His story about the use of cash instead of checks is not credible. If he kept no record of his large money transactions, his associate in these matters had three bank accounts, and, in his dealings in this estate which can bear the light, he used them. Our concern is not with him, but with the executor.

The referee proceeded as if the sole question concerning the purchase of these claims was as to whether the funds of the estate were used. On that theory he erroneously excluded the transcript of the personal account of the executor with the West Side Bank. The executor is to be charged with the entire amount of the profit of

those purchasers, if he had any interest in them. If he used the money of the estate in prosecuting his speculation, and took assignments to his dummy, he was guilty of an obvious direct fraud. If he used his own money, he was guilty of a constructive fraud, or an offense against his duty as an executor, and he cannot be permitted to retain the profits of a speculation in claims against the estate of which he was the trustee. Van Horne v. Fonda, 5 Johns. Ch. 388, 408; Ex parte Lacey, 6 Ves. Jr. 625, 628; Trimble v. James, 40 Ark. 393, 403.

As to these two transactions, I will reverse the finding of the referee, and find as fact that the claims were purchased by the executor with the funds of the estate, and that the assignments were procured solely for the purpose of furthering his own personal interest, and I will determine that his account must be surcharged to the extent of the entire profit.

The executor makes charges for services alleged to have been rendered by his son as bookkeeper and collector, and for disbursements for car fares and stamps, aggregating $905.11. The entire amount collected was $2,028.55, and I have been led to make a somewhat careful examination of this claim. The only books submitted are a daybook, out of which a large number of pages have been torn, leaving entries on dates all earlier than the period of this accounting, a ledger, and a letter copying book. The ledger account contains entries of the receipts shown in the account, and its references to pages of another book lead me to infer that a daybook was kept, and that the original entries of these collections were on pages 44 to 50 of that book—seven pages in all—which was not produced before me, though the minutes of the trial before the referee show that it was before him. No bankbook, or any book showing checks drawn by the executor, is before me. The amounts collected were all from 22 separate accounts. The business of the testator was the sale of the fixtures and furniture of barber shops, upon which he took back chattel mortgages, payable in installments, and these accounts were transactions of this nature. The payments were generally made monthly, though in some instances the periods for payments were longer. In view of the remarks of counsel for the executors as to the difficulties of collection, I was somewhat surprised to notice the promptness with which most of the payments were made, and the smallness of loss. All of the debtors were in New York county, except two who were in Brooklyn, and one who was in West Orange, N. J. The letter book contains copies of letters written by the executor, reminding delinquents that the collector had called, and that they were in default, and I conclude that personal demands were made. It was not unreasonable for the executor to employ a collector, but the amount to be allowed him for this cannot be fixed arbitrarily by him without proof of its reasonableness. This is not a claim of a creditor of the decedent against the estate, which may be allowed by him so as to establish a legal presumption, but it is a claim of his own, as to which the burden of proof rests upon him; and I do not find evidence in the record as to the value of the service rendered him, or the actual disbursement for "car fares and

stamps," which would sustain his contentions. In the case of the account against Antonia Gianattasio, of West Orange, N. J., on pages 41 and 42 of the ledger (the only debtor out of this city), a commission of $1.50 for each collection of $10 is deducted, and the amount obtained, or $8.50, is put into the account. There were 233 entries of receipts, varying from 75 cents to $40 each, and an aggregate charge averaging nearly $4 for each of these collections seems to me exorbitant. We will deal generously with the executor if we allow him for the collections made in New York and Brooklyn at the same rate he paid for the New Jersey collections, to wit 15 per cent. The recording of the fact that such collections had been made should be included in this. All of the charges for services of a collector and for car fares and stamps will be disallowed, in excess of $304.28 allowed in lieu thereof.

The services rendered by the counsel for the executor are conceded to be of the value claimed by and paid to him. They were rendered in the interest of the estate. None of them were rendered in bolstering up or defending the transaction commented on in this memorandum. The payments to counsel are therefore approved.

I will not impose any charge on the executor for interest. As a matter of fact, he never had any large amount of money on hand, though his account may appear to show otherwise, because he used funds of the estate for purchasing claims against the estate. For this he is already charged, and it would be difficult to compute a fair charge for interest on the balances he retained, without risk of doing him an injustice.

In all other respects the report of the referee is confirmed.

The character of the objections sustained and of the facts disclosed by the record is such as to require that the executor should forfeit every claim to discretionary favor. He will be refused commissions and costs, and he will be charged personally with the costs of the proceeding.

Decreed accordingly.