# REPORTS.

## CHESHIRE,

### JULY TERM, A. D. 1850.

## SPARHAWK & a. vs. ALLEN & a.

A person holding a fiduciary position cannot deal with property intrusted to him, for his own benefit; but the profit of any contract he may make concerning it belongs to the owner of the property.

A guardian cannot retain for his own use the benefit of any contract he may make affecting the property of his wards, but such benefit belongs to them.

If however they adopt the contract thus made they must take it *cum onere.*

A guardian can make no legal contract relating to the property of his wards by which he injures them and benefits himself.

The defendant, Allen, was guardian of the orators, who were minors. He was also the executor of a will by which the testator devised certain property to his wife, less in value than that to which she would be entitled as her distributive share under the statute, and made the orators residuary legatees. After the death of the testator the defendant and the widow agreed, without the knowledge of the orators, that she should waive the provision made her by the will, and take her distributive share of the estate, and should then convey all the property to the defendant, in consideration of which he agreed to support her, and to pay a certain annuity to her brother, and conveyances were made in pursuance of this agreement. Upon a bill in equity by the wards against the guardian to set aside the conveyances, it was *held* that the purchase by the guardian could not be sustained for his own benefit, and to the injury of his wards, and that the profit of it belonged to them, but that if they adopted it they must take it subject to the consideration the guardian had agreed to pay.

As the consideration for the purchase was entire, and as the Court would not interfere with any purchase the guardian might lawfully make, the guardian was allowed sixty days in which to make his election whether he would hold

all the property conveyed to him, as trustee of his wards, accounting to them for the surplus income after making the proper deductions, or would convey to them all the property except such as the widow was entitled to under the will.

IN EQUITY. The orators are infants under the age of twenty-one years, and children of John B. Sparhawk, who died on the 2d day of April, 1846. On the 18th day of that month George Sparhawk, being possessed of real and personal estate, amounting to the sum of about nineteen thousand dollars, made his will by which he bequeathed to his wife, Mary Sparhawk, one of the defendants, one half of his personal estate. He also devised to her the use of one third part of his real estate, and all the residue of his property he devised to the orators, and made the defendant, Allen, his executor. The testator died on the 13th day of February, 1847, leaving no lineal descendants. On the 7th day of April, 1846, Allen was appointed administrator of the estate of John B. Sparhawk, and guardian of the orators. Mrs. Sparhawk was infirm, and about seventy-five years of age.

The bill alleged that Allen, in violation of the trust reposed in him as guardian, and for the purpose of appropriating to himself a portion of the estate devised to the orators, without their knowledge or that of Mrs. Sparhawk, previous to the 18th day of February, 1847, caused certain instruments to be prepared purporting to be her acts, and by misrepresentations as to their effect induced her to execute them at a time when her mind was fully occupied by the then recent death of her husband; that by one of these instruments she waived the provisions of the will, and requested that dower might be assigned her; that she also executed a deed by which, in consideration of six thousand dollars, she conveyed to Allen all her interest in the estate of her late husband, including all her interest as devisee under his will, and also upon her waiver of the provisions of the will, which waiver she then made, all her right and claim of dower in the premises, and all her distributive share in the property, which deed also contained a covenant that she would make all further necessary conveyances, and that

she also made a bill of sale of the personal property to the defendant.

The bill then alleged that Allen paid no other consideration for the deed than a bond conditioned to support Mrs. Sparhawk during her life and to pay an annuity of fifty dollars to her brother for the same period, which consideration was grossly inadequate and was secured to her merely for the purpose of giving Allen a colorable title to that portion of the estate belonging to the orators, which he attempted to secure to himself; that Allen, though the guardian of the orators, fraudulently concealed from them the knowledge of these transactions, and for a long time affirmed to them that none such had taken place, and that nothing had been done affecting their interest in the devises contained in the will, and so continued to affirm to them until after his removal from his office of guardian on the third Tuesday of March, 1847, and the appointment of George Huntington in his place.

It was also alleged that Mrs. Sparhawk's request that dower should be assigned her, though bearing date on the 2d day of March, 1847, was in fact prepared and signed on the 18th day of February previous; that it was presented to the Judge of Probate on the 2d day of March, and that the report of the committee assigning the dower was approved on the first Tuesday of May; that Allen went into possession of the land, and still retains it, claiming to hold it and all the property mentioned in the instruments by virtue of his deed from Mrs. Sparhawk; that although she knew the instruments were executed at the instance of Allen, and has admitted that she signed them without knowing their contents, and was satisfied with the provisions of the will, and had not, to her knowledge, waived them, nor assented to any thing whereby the share of the orators would be diminished, still permits him to keep possession of the land and of the instruments; and that the orators and Huntington, on the 10th day of June, 1847, requested her and the defendant to reconvey the estate to them, and to cancel all the conveyances affecting their title to the estate, which they have declined to do. The bill then charged a combination between

the defendants to defraud the orators of a portion of the estate devised and bequeathed to them by the will, in violation of Allen's trust as guardian, and for his benefit, and prayed a discovery, and that the defendants be decreed to reconvey to the orators all that portion of the estate which belonged to them by the provisions of the will, and that all the instruments in any way affecting their title be cancelled, and for general relief.

The answer of Allen stated that about three months before the death of the testator, Mrs. Sparhawk complained to him of ill treatment and neglect in the family, and proposed to him, he being her nephew and having always enjoyed the confidence of herself and her husband, that in case she should survive her husband, Allen should take what was to come to her out of her husband's estate, and see that she should be well taken care of during her life, which was the first time the subject was mentioned to or thought of by the defendant. Soon after the death of the testator, the defendant informed her what were the provisions of the will, and what her rights were if she should waive those provisions, and she then decided to waive them, and an agreement was made for her support and for the payment of the annuity, and it was also agreed that the defendant should cause proper instruments to be drawn up to carry the agreement into effect, which was accordingly done. When the agreement was made she requested him, for reasons personal to herself, not to inform the orators of it, which he did not do until about three weeks afterwards. All the papers were explained and read to her, and were fully understood by her before their execution. The answer denies that the papers were prepared without Mrs. Sparhawk's approbation and knowledge, or that any persuasions were used, or any misrepresentations made to her as to their effect.

The answer of Mrs. Sparhawk states that the papers were such as Allen procured to be drawn up without any agency of hers. Some of the papers were read in her hearing, and she looked at some of them, but did not examine them so as to understand their full effect. It was never her intention to waive the provisions of the will, and if her name is to any such paper

she signed it without knowing what it was. She did not intend to do any thing the effect of which would be to take from the orators any part of the property they would be entitled to under the will. She supposed she conveyed to Allen only the interest she had in the property devised her, and intended to do only that, and desires that the writings should be altered so as to effect that intention.

*Wheeler*, for the orators. 1. This is a case of constructive fraud originating in a breach of trust, and this court has power to grant the relief sought. R. S. ch. 171, § 6. Jeremy, after treating of the jurisdiction of courts of chancery in certain classes of cases where there has been a breach of trust says, — "And indeed, it may perhaps be laid down that the same principles apply wherever confidence is reposed, and one party has it in his power in a secret manner for his own advantage to sacrifice those interests which he is in conscience bound to support." Jer. Eq. Jur. 396. Mr. Justice *Story's* language on this point is, — "The doctrine may be generally stated, that wherever confidence is reposed, and one party has it in his power, in a secret manner for his own advantage, to sacrifice those interests which he is bound to protect, he shall not be permitted to hold any such advantage." 1 Story's Eq. Jur. ch. 7, § 322. *Griffiths* v. *Robins*, 3 Madd. 105, is the leading case upon this doctrine. The marginal note is, that "a deed of gift was ordered to be delivered up, as obtained by undue influence over the donor, who was eighty-four years old and nearly blind, and placed confidence in the donee." Mary Morris, the original plaintiff, had confided in the defendant, who married her niece, and was dependent upon him for assistance and kindness. The Vice-Chancellor says "they (the defendant and wife) stood therefore in a relation to her, which so much exposed her to their influence, that they can maintain no deed of gift from her, unless they can establish that it was the result of her own free-will, and effected by the intervention of some indifferent person. . . . I do not think it necessary, however, to enter into all the transactions stated to be attendant on the deed, and in the manner in which it was pre-

1*

pared. It is sufficient to say that the defendants have not made out that case which the policy of this court requires from persons standing in that relation to the donor in which they had placed themselves."

The transactions set forth in the bill were in fact a fraud on the part of Allen both upon the orators and on Mrs. Sparhawk.

2. Courts of Equity require the utmost good faith on the part of guardians towards their wards. They will not suffer the guardian, directly or indirectly, to enrich himself at the expense of his ward, or in any way to appropriate the ward's property to himself. And this watchfulness over the interests of wards extends even beyond the time when the guardianship ceases by law. 1 Story, Eq. 312, § 317. "The guardian's trust is one of obligation and duty and not of speculation and profits. . . . He cannot reap any benefit from the use of his ward's money." . . . "He cannot act for his own benefit in any contract or purchase or sale as to the subject of the trust." 2 Kent's Com. 229. "The relative situation of the parties imposes a general inability to deal with each other." 1 Story, Eq. 312. "If the court does not watch these transactions with a jealousy almost invincible, in a great majority of cases it will lend its assistance to fraud." *Hatch* v. *Hatch*, 9 Vesey, 297.

3. By the devise, the death of the testator, and the probate of the will, the estate in question vested in the orators; and it was devested by the wrongful acts of their guardian. There could not properly be a waiver of the provisions of the will, until after the probate; and the orators then took, by relation back, a vested estate from the time of the testator's death.

*Handerson*, for Mrs. Sparhawk.

*J. Parker*, for the defendant, *Allen*.

1. As against Mrs. Sparhawk, if she stood alone, there is no pretence for relief. She but exercised a legal right. Any declaration that she may have since made that she did not know it could affect the complainants, or any matter in her answer of that character, could not affect her. She intended to waive

the provisions of the will. That appears throughout. She had the right to do so, she did so, and the legal effect, whatever it may be, follows. Her title to the property could not be impeached, and of course, ordinarily, the title of any one holding under her must be good.

2. The defendant Allen holds under her and has her rights. He well maintains his defence upon her title and transfer, unless the case shows something which will charge him with a trust when the property comes into his hands which would not avail to charge her while it remained in her hands, or in those of her grantee. If he may be so charged, it is by reason of some peculiar duty and consequent liabilities resting on him, by reason of which he cannot claim to stand, as any one else might, in as good a situation as the party from whom he derived his title.

3. There is no duty or liability which should prevent him from availing himself of the right acquired by the transfer from her, arising from any contract on his part with the complainants to procure the property for them or to act as their agent in any negotiation for acquiring it either from her or from the testator. The case is not within that class where agents employed to make purchases or to do any acts in relation to property, violate the duty they have undertaken by such employment, by making purchases or contracts for their own benefit instead of acting for their employers.

4. The only duty which Allen owed to the orators was of a fiduciary character, arising out of the relation of guardian and ward, or as executor of the will of the testator, the complainants being legatees. If he can be made liable it is by some breach or violation of such duty. He owed them no duty in this particular as administrator of the estate of their father.

5. As executor of the will, he was bound to administer upon the estate according to the will and the rules of law, and to pay and deliver over to the orators whatever they were entitled to receive from him as executor. As guardian, he was bound to take the custody of any property which belonged to them, to take due care of it, and if he might, by reasonable diligence, to procure an income from it. He was perhaps bound also to

appropriate so much of the income and principal as was necessary for their support and education. His duty as guardian of their persons cannot come in question in this case.

6. He was under no obligation, either as guardian or as executor, to endeavor to procure property for the orators by gift or otherwise except by way of income from the estate, which belonged to them. Nor was he bound in either capacity to abstain from advising persons not to give to them, or from otherwise preventing property other than the income from this estate, from coming to them by any act which would be lawful in third persons. As executor or guardian he owed them no duty in this respect, and his liability is only commensurate with his duty.

7. If the testator had intended to give them all his estate, and Allen had solicited him not to bequeath any thing to them, but to give the estate to him, in consequence of which they had been omitted, and he had been made sole legatee, there would have been no pretence for charging him either from his being executor or guardian, or from any other consideration.

8. It follows that he is not liable, from any suggestions to Mrs. Sparhawk, or solicitations even, that she would exercise her legal rights, take what the law gave her, and convey it to him, or by the exercise of those rights, and the transfer of the property to him, unless it had passed to him, so that he, as executor or guardian, was chargeable with the custody of it for their benefit. If he owed no duty except as to their property, and if he might have advised the testator to exercise his legal rights in order to obtain the property himself, he might equally well advise Mrs. Sparhawk to exercise her lawful power over the subject-matter for the same purpose, unless the state of things was changed so that the property by the will passed to them. In order to charge him, they must show title under the will. They are not heirs at law.

9. The property never passed to them so that he, as executor or guardian, could be charged with any duty in relation to it. They never had any title ; the devise to them was, by operation of law, subject to her right to waive the provisions of the will,

and take her distributive share. Having waived her rights under the will, the devise to her became void. Rev. St. 314. She took by descent, and nothing of what she thus took ever passed to them by the will. There was not, upon general principles, aside from the statute provisions above referred to, any thing ever vested in them.

10. But if the general proposition might be supposed to admit of argument, and if it might be held, where the waiver was not made until after the proof of the will, that the estate vested in the residuary devisees, subject to be devested by the waiver by Mrs. Sparhawk, and her claim of dower, and that in such case she would hold her distributive share by descent, on the principle of relation back, there having notwithstanding been an intervening estate in the devisees, in the mean time, that is not so here, because the waiver was before any thing could vest in the orators as residuary devisees under the will, which could not pass any estate to them or to any person until its probate. This is entirely clear under the provisions of Rev. St. 313. Upon the probate of the will, if nothing had intervened to prevent it, the estate would vest in them, and if they continue to hold it they might, by relation back, have been deemed seised from the decease of the testator. But long before the probate, the widow waived the provisions for her, and claimed her rights. This appears from the bill and from the answer. The waiver and claim for distribution, as in case of intestacy was filed in the probate office, and became complete and binding on the 19th day of February. The devise to her was then void as if it had never been made. She was then entitled under the Statute of Distributions. Her title had relation back to the decease of the testator, not to defeat any title which they had in the intermediate time, but to preserve the succession to the freehold unbroken. She took as if the will had never been made. There is no intervening estate between her and the testator, and never has been. When the will was proved and became operative, upon the 2d of March, the residuary devise did not and could not operate upon any thing that she had thus entitled herself to as part of her share in the

estate. As to what she thus took, the will was to the residuary devisees as it was to her, entirely inoperative. There could, of course, be no relation back in their favor. And the case stands no better for them than it would if the testator had expressed a wish that they should have the property in question, and then died without making a will. They never had even a contingent interest. It cannot surely be said of the intended provision for her inserted in the will, that the title vested in her and was devested by her waiver of the provision before the probate of the will. As little can it be said of the provision for the orators so far as the provision operated upon it.

11. As executor, then, he not only owed them no duty, but he had no power to take any charge for their benefit, until the probate of the will. As guardian he could not enter upon the land, nor do any act about it, until after the probate of the will. Upon the probate, they had no right so far as this estate is concerned, and never had any. And this shows clearly that Allen has not failed to perform, nor violated any fiduciary duty. The utmost that can be said is that he may have had some influence in preventing the property from ever coming to them, by a bargain with Mrs. Sparhawk, which induced her to waive the provisions of the will and assert her legal rights. This he had a right to do. Most persons would not hesitate to do it, and what equity is there in favor of the orators ?

12. If we apply the most general language of the books, without reference to its connection and the facts to which it has relation, the defendant cannot be watched with jealousy, until he is shown to be trustee in this matter — until the fiduciary relation exists. He is not shown to have availed himself of any information which he acquired while acting as executor or guardian, to their prejudice. There was no interest which he was bound to support and protect, and he had no duty to perform to them in relation to this property.

13. For the reasons now suggested, the orators cannot be regarded as having had an estate in the property by virtue of the will taking effect upon the death of the testator, and defeated

subsequently by Mrs. Sparhawk's waiver. If they might be regarded as having such an estate, subject to be defeated by the exercise of her right, we should contend that the estate, being in its nature subject to be defeated, and being lawfully defeated by the exercise of her legal rights, must be treated for all purposes as if it had never existed, and could not now be set up as if it had existed, so as to charge Allen with any duty to them. But it is not necessary to go into that argument, because it seems so entirely clear that they never had even a defeasible title.

14. The same result will be attained by another and a much shorter view. The estate belonged to the testator. The law gave him power to devise, but made that power subordinate to the right of the widow to waive the provisions of the will and take her distributive share under the provisions relative to intestate estates. By the waiver, she takes by descent directly, a distributive share, and not by defeating any estate given by the will. It is precisely the same as if the statute had said that this power of devise should not take effect so far as relates to the distributive share of the widow if she shall elect to waive the provisions made for her, and take her distributive share.

*Chamberlain,* on the same side.

GILCHRIST, C. J. The estate of the testator, according to the Inventory was as follows :

| | | |
|---|---:|---:|
| Personal estate, . . . | $4,341.23 | |
| Deduct for debts, including Allen's claim of $1000 . . | 1,573.17 | $2,768.06 |
| Real estate, . . . . . . | | 15,152.84 |
| | | $17,920.90 |

There was devised to Mrs. Sparhawk, by the will,

| | |
|---|---:|
| one half the personal estate, . . . | $1,384.03 |
| One third of the real estate during her life . | ʻ5,050.94 |
| | $6,434.97 |

By the statute she would be entitled, on waiving the provision made her by the will, R. S. ch. 165, §§ 8 & 9, as her husband

left no lineal descendants, to one third of the land during her life, as dower,   .   .   .   .   .   .   $5,050.94
also to one third of the residue in fee, which would
be   .   .   .   17,920.90 — 5,050.90 = 12,869.96
one third of which = 4,289.98
Deducting from the sum she would have in fee by
the statute   .   .   .   .   .   .   $4,289.98
the sum given her absolutely by the will   .   .   1,384.03
she would receive the sum of   .   .   .   $2,905.95
by the negotiation with Allen, more than the sum given her by the will, of which Allen would receive the benefit, and which must of course be deducted from the share of the orators, who are the residuary devisees.

For the purpose of determining the principles which should govern this case, it is necessary to examine the authorities at some length.

There is a certain benefit which a guardian may legitimately derive from his position in relation to his ward. He may receive a reasonable compensation for his services. But even this rule, when considered in relation to trustees, is of comparatively recent origin. In *Robinson* v. *Pett*, 3 P. Wms. 250, Lord Chancellor *Talbot* said it was an established rule, that a trustee, executor, or administrator, should have no allowance for his care and trouble. This rule has been changed for another, proceeding on more liberal principles, but its existence shows the extreme caution which has always been exercised by the courts in omitting to put any temptation in the way of persons occupying a fiduciary relation. Lord *Hardwicke* said, in *Ayliffe* v. *Murray*, 2 Atk. 58, that chancery looked upon trusts as honorary, and a burden upon the honor and conscience of the trustee, and not undertaken upon mercenary motives. Although all persons occupying these positions are now allowed a reasonable compensation, still the feeling of the necessity of watchfulness which dictated the original rule exists in all its force, and can be perceived in the reasoning of the courts whenever an inquiry is made into the character of transactions affecting the trust property. The conduct which the court of chancery intends to require is such as

would result from the moral sense of a conscientious man. It frowns upon what, in the language of Chancellor *Kent*, " is repugnant to a sense of refined and accurate justice." 5 Johns. Ch. Rep. 407. So far has this doctrine been carried, that where there were two joint devisees of land in possession but the title was imperfect, it was held that one of them could not buy up an adverse title and expel his co-tenant, but that the purchase would enure to their common benefit. *Van Horne* v. *Fonda*, 5 Johns. Ch. Rep. 388. Such conduct is said by Chancellor *Kent* " not to be consistent with good faith, nor with the duty which the connection of the parties, as claimants of a common subject created." " It would be immoral, because it would be against the reciprocal obligation to do nothing to the prejudice of each other's equal claim which the relationship of the parties, as joint devisees, created." " There was a mutual obligation to deal candidly and benevolently with each other and to cause no harm to their joint interest." We have given the language of this eminent lawyer, because it expresses the high standard by which the court tests the conduct of parties, and that too in a case where ordinarily no fiduciary relation is supposed to exist.

The following is, as we understand it, the substance of the acute and ingenious argument on the part of the defendant.

The defendant's only duty arose from his position as guardian of the orators, or as executor of the will under which they were legatees.

He was not bound to endeavor to procure property for them, or to abstain from advising persons not to give to them, or from preventing property from coming to them, by any act which would be lawful in third persons.

He might have solicited the testator to give *him* his estate, and not the orators, and if successful, he would not have been chargeable.

Consequently, he is not liable on account of his suggestions and advice to Mrs. Sparhawk to exercise her legal rights, and convey the property to him, unless it had passed to them so that he was chargeable with its custody for their benefit, and in order to charge him they must show title under the will.

The property never passed to them so that he could be charged with any duty in respect to it. The devise was subject to her right to waive the provision in the will. Having waived her rights the devise to her became void, and she took by descent.

The waiver was before any title vested in them under the will, for that passed nothing until the probate, and the waiver was before that.

By the waiver, the devise to her became void, and her title had relation back to the death of the testator, and she took under the Statute of Distributions.

Therefore he violated no fiduciary duty in relation to the estate which she took. All that can be said is, that he might have had some influence in preventing the property from coming to them, by a bargain with her which induced her to assert her legal rights. Most persons would not hesitate to do this, and why should the guardian? There was no interest which he was bound to protect, and he had no duty to perform in relation to the property.

It may be remarked that even in the absence of fraud, a person holding a fiduciary relation is precluded from doing certain things for his own benefit, which strangers might do for their benefit. If a guardian buy up the incumbrances on his ward's estate at an under value he must not charge the ward with more than he paid. 2 Ch. Cas. 245. But a stranger may do this, and the reason why a guardian may not is derived from considerations of public policy. It is held in *Hatch* v. *Hatch*, 9 Vesey, 292, that such considerations should weigh in a case where a conveyance was made by the ward to the guardian, and upon considerations of public policy the conveyance was set aside after a great lapse of time. Lord *Eldon* said, — "If the court does not watch these transactions with a jealousy almost invincible, in a great majority of cases it will lend its assistance to fraud." In *Whichcote* v. *Lawrence*, 5 Ves. 750, Lord *Loughborough* said, — "It is very plain in point of equity, and a principle of clear reasoning, that he who undertakes to act for another in any matter, shall not in the same matter act for himself. He is not acting with that want of interest, that total absence of tempta-

tion, that duty imposed upon him, that he shall make no profit. In whatever shape that profit redounds to him, whether by management, which is the common case, or by superior good fortune, it is not fit that the benefit shall remain to him." So executors cannot for their own benefit buy the debts of the creditors, although the transaction may be morally right, because the policy of the law makes it impossible for them to do any thing for their own benefit. *Lacey, ex parte*, 6 Vesey, 628. A trustee in a renewable lease endeavored fairly and honestly to treat for a renewal on account of the *cestui que trust*, but the lessor positively refused to renew to him, and the trustee then took the lease for himself. But it was held to be so difficult to be certain that in such cases there was not management, that the trustee was not permitted to hold it, though, as Lord Chancellor *King* said, "it might seem hard that the trustee was the only person of all mankind who could not hold the lease." *Keech* v. *Sandford*, 3 Eq. Ca. Ab. 78. Speaking of this case Chancellor *Kent* says in *Davoue* v. *Fanning*, 2 Johns. Ch. Rep. 260, that the decision has never been questioned, and also says, "if we go through all the cases, I doubt whether we shall find the rule and the policy of it laid down with more clearness, strictness, and good sense." The case of *Keech* v. *Sandford*, is stated by Lord *Eldon* in *Ex parte James*, 8 Vesey, 345, and he says, that the doctrine as to purchases by persons having a confidential character stands much more upon general principle than upon the circumstances of any individual case. It would seem that after the refusal of the lessor to renew the lease, the trustee ceased to be such as to the lease, but that made no difference. In *Whelpdale* v. *Cookson*, 1 Ves. Sr. 9. Lord *Hardwicke* said that where a trustee has a prospect of advantage to himself, there is a great temptation to be negligent, and to act in such a manner as not quite to fix an imputation upon him. In *Davoue* v. *Fanning*, Chancellor *Kent*, says, in speaking of a purchase by a trustee from a *cestui que trust* "however innocent the purchase may be in the given case, it is poisonous in its consequences." In *Ex parte James*, a solicitor to the bankrupt commission was not permitted to purchase the property at auction, and this decision was expressly put, not

on the ground of want of fairness, but on the general principle that the solicitor had a confidential character. In *Davoue* v. *Fanning*, Chancellor *Kent* says that the principle pervades the whole body of the cases, that the question is not whether there was or was not fraud in fact. The case of the *York Buildings Co.* v. *Mackenzie*, 8 Brown's Par. Cases, shows how far the principle has been carried. The estates of an insolvent company were sold by auction at a price fixed by the court, and called the upset price, founded upon information procured by a person called in the Scottish courts "the common agent." He bid the upset price, no one offering more, and the sale was confirmed by the court, and he expended, in the course of eleven years, large sums for buildings and improvements, and there was no question as to the fairness and integrity of the purchase. The reasons stated by the appellant were, that he who is intrusted with the interests of others, cannot make the business an object to himself, because from the frailty of nature, one who has power will be too readily seized with the inclination to serve his own interest at the expense of those for whom he is intrusted ; that the danger of temptation, from the necessity of the case, works a disqualification, and that the wise policy of the law had therefore rendered the person who had the one part intrusted to him incapable of acting on the other side. All the principles above-stated are recognized in their fullest extent in the case of *Davoue* v. *Fanning*, where, after a very able analysis of the authorities, the Chancellor decided that if a trustee, or person acting for others, purchase the trust estate, the *cestui que trust* will be entitled to have the sale set aside as of course, however fair the transaction may have been. And in 1 Story, Eq. Jur. § 323, the same result is said to follow from the authorities.

The gist of the defendant's argument is, that as the property never vested in the orators, he was not a trustee for them, and occupied no fiduciary position in relation to the property, and consequently was as free to make a bargain about it for his personal emolument as a stranger would be. If no broader view than this of the duties of a guardian can be taken, the position is correct. The authorities referred to, show the extreme jea-

lousy with which the courts watch the proceedings of any one, who, being intrusted with the charge of the interest of others, attempts to make his charge a source of personal profit. Nothing can be more pointed than the language of the eminent lawyers who have discussed the question. Some of the cases have a direct bearing upon the present one. In the *York Buildings Co*. v. *Mackenzie* the " common agent " was not a trustee until, by making the business one of personal emolument, he made himself a trustee. He was merely appointed to look after the interests of the parties concerned. Was not Allen appointed to look after the interest of the orators, his wards ? In the case of the renewal of the lease, *Keech* v. *Sandford*, the *cestui que trust* was not injured because the lessor refused to renew it for his benefit, and it would seem that then the trust ceased, but the general interests of justice were held to require, as Lord *Eldon* said, that such transactions should not exist. Here, the wards *were* injured and the guardian was benefited. Is there nothing here by which the interests of justice may be supposed to be perilled ? In the case of the joint devisee who bought in the adverse title, *Van Horne* v. *Fonda*, the purchaser was not bound to look after the interests of his co-devisee, but he was not permitted to do any thing to injure them, and to benefit himself. Simply as a co-tenant he occupied no fiduciary position which did not exist much more decidedly in the present case.

But it is said that the orators had no vested interest in this property. Supposing this position to be sound, is this a safe criterion by which to judge of the propriety of the guardian's conduct ? Is he not bound upon every principle to look after a contingent remainder, which may be of the last consequence to his wards ? It is said, also, that he was under no obligation either as executor or as guardian to endeavor to procure property for the orators except by way of income from their estate. Let us suppose that he had been guardian only, that a stranger had been executor of the will, and that the executor had omitted to cause the will to be proved, in a case where the whole interest of his wards was of such a character that it might have been defeated by the exercise of the legal rights of a third person.

2 *

Would there be no obligation in common fairness and fidelity resting upon the guardian to take some interest in the probate of that will; to exert himself somewhat that the affairs of his wards committed to his charge should be managed with, at least, that reasonable sagacity which is applied to the ordinary business of life? It is going sufficiently far to say, that he may fold his arms, and sit down and let the property go where it may without perplexing himself on the subject. It certainly is not requiring an unattainable degree of perfection, to ask that he shall at least be content with doing nothing, and that he shall not be the instrument by which the property is diverted from the channel in which, but for his interference, it might have flowed, and is made a source of profit to himself. It is said that this is not the case of an agent employed to make purchases who violates his duty by buying for himself. If he were not the agent for his wards, who was? The law prohibited them from managing this property themselves. Their contracts would be invalid. To whom, then, were they to look with confidence that their interests would be protected and their incapacity supplied, but to their guardian? If the law requires in a guardian neither self-denial, nor an integrity that will be above mercenary motives, nor a diligent attention, nor a single eye to the interest of his wards, why is he appointed? If any adult, of ordinary business capacity, had been in the situation of these devisees, he might, with perfect propriety and honesty, have advised Mrs. Sparhawk that, as she was comfortably provided for by the will, it would be fitting that she should pay some regard to the wishes of her deceased husband and permit his will to be executed according to his intentions. The guardian not only did not do this, but he did the very reverse of it. Is it asking too much of human nature to require that he should do this; or if it be, to demand of him that he should not aid in defeating the provisions of that instrument which he was doubly bound, as executor and as guardian, to enforce? Let us suppose that the precise course of conduct followed by the guardian could have been foreseen by the Judge of Probate when application was made to him for the appointment of Allen. Let us suppose that his conversations with Mrs.

Sparhawk, the concoction of the bargain, the execution of the deeds, the omission to inform the orators of the matters in progress, and the effect of the whole upon their pecuniary interests, had been all anticipated by the Court of Probate. In the face of all these, would Allen have been appointed to this trust? Would any tribunal have fancied itself employed in the administration of justice by making such a decree? If, as we believe, such conduct would not then have been deemed justifiable, as little can it be considered proper now. A guardian is a person upon whom the law imposes the duty of looking after the pecuniary interest of his wards. In doing this duty he is bound to exercise at least that ordinary diligence which is applied to the common affairs of life. This, the defendant did not do, for knowing from his own account that Mrs. Sparhawk intended to take a step that would injure his ward, he did not oppose it, or advise against it, or even inform his wards of it, that they might, if they should choose, procure some person who should manifest that interest in their affairs which their guardian did not seem to feel.

The evidence tends to prove, and we do not understand it to be denied, that Allen took an important part in the transaction from the first suggestion of the purchase to the final result. Suppose, for the sake of the argument, that he used no influence over her, that he did not thrust the plan upon her, that he did not weary her with his solicitations. Still, admitting all this, he was the passive recipient of all her ideas upon the subject; he made use of no argument to dissuade her from her purpose; he did not remind her, as he might well enough have done, that the provision made her by the will was ample for all her wants; and he omitted for several weeks, as he says at her request, to inform the orators of the projects which he and Mrs. Sparhawk had been discussing. If such facts only had existed, and the result had been to his profit, the authorities seem to settle that he could not retain the benefit of the transaction. But he went farther than this; and to suppose that during all this period while the matter was yet incomplete, while he was preparing the various papers for her signature, it did not stimulate his exertions to reflect that all this was very much to his own personal profit,

Sparhawk *v.* Allen.

and did not induce him to use one argument in favor of her purpose, would be to put an unnatural construction upon his conduct, and to presume that he had a greater degree of self-denial than men in general possess. And if, in omitting to communicate the proposed purchase to the orators, he was actuated solely by a regard to her wishes and not to his own interest, he was remarkably free from selfishness. But it is enough that the whole was one transaction, in which, from the beginning to the end, he was concerned; that his interest as guardian was in opposition to the purchase, and his interest as an individual was in favor of it, and that the former gave way to the latter. He was, in the large sense of the word, an agent, intrusted with important interests, which, upon every consideration it, was his duty to guard. And we do not think that the limits of his duty are to be determined by the technical character of those interests, or that he was free to act as he chose, provided they could not be transferred by deed, or recovered in a writ of entry.

The judgment of the court is, that the purchase by the guardian was, under the circumstances, illegal, and he cannot derive any benefit from it. He must be regarded as having purchased the property of Mrs. Sparhawk for the benefit of his wards. We shall not, of course, interfere with any contract he might lawfully make with her. The consideration for Allen's contract was entire, and he should not be compelled to perform it if he is to lose any part of the consideration. If the orators adopt his contract they must take it *cum onere.* All the property he received from Mrs. Sparhawk is chargeable with the burden of his contract, and the surplus income, after performing the contract, belongs to the orators. Under the circumstances, he should have an election. He may, within sixty days, elect to hold the property as trustee for the orators, charging the income with the support of Mrs. Sparhawk, and with the annuity to her brother, and accounting to them for the surplus; or he may convey to them by a deed, with proper covenants against any incumbrances made by him, all the property he received from Mrs. Sparhawk, except so much as she would be entitled to under the will: and there must be a decree accordingly.