## NALLE, Appellant, v. THOMPSON et al.

### Division Two, March 31, 1903.

1. **Ejectment: TITLE OF PLAINTIFF.** Plaintiff can not recover in ejectment if he has only an equitable title in the land. If the plaintiff and defendant bought by deed from a widow who had elected to take the one-half interest in her husband's estate subject to his debts, and afterwards defendant bought in the land at a foreclosure sale under a deed of trust made by the husband and wife in his lifetime, the legal title passed to defendant, and the widow's equitable title was extinguished, and therefore plaintiff can not maintain ejectment for the land, even though the plaintiff paid the entire consideration for the trustee's deed at the foreclosure sale. It is the legal title only that is recognized as the ground of an action in ejectment.

2. ———: ———: **COTENANTS: EQUITABLE INTEREST.** If two persons are cotenants in land and one of them buys a prior title at a foreclosure sale under a deed of trust and the property is conveyed to him by the trustee, the title does not vest in them as tenants in common, for title to land can only be conveyed by deed, and such a deed, at most, because of the relation of cotenancy, only creates an equitable one-half interest in the other cotenant, which can be asserted and declared only in an equitable proceeding.

Nalle v. Thompson.

3. ———: ———: ———: ———: SUBSEQUENT GRANTEE: NOTICE.
Nor will such equitable proceeding affect a subsequent grantee of the
cotenant who bought at the trustee's sale unless he be made a party,
and not then unless he had notice, prior to his purchase, of plain-
tiff's equitable interest.

4. Estoppel: CLAIMING BOTH LAND AND PROCEEDS OF SALE. One can
not either in law or equity, claim both land and the proceeds arising
from its sale. If he has sued a cotenant in whom was the title for his
share of the proceeds of a sale by such cotenant, he is estopped from
bringing suit for the land or any interest therein, for by his suit
for the money he has ratified and confirmed the sale. And such estop-
pel may be pleaded where the suit for the land is brought against a
subsequent grantee of plaintiff's cotenant.

Appeal from Madison Circuit Court.—*Hon. Frank R.*
*Dearing,* Judge.

AFFIRMED.

*William N. Nalle pro se,* with *Anthony & Tesereau.*

(1)    Respondents had full and actual notice of ap-
pellant's title as cotenant, in fee, and homestead, with
their immediate grantor.    Loring v. Groomer, 110 Mo.
632; Patterson v. Booth, 103 Mo. 402; Tidings v.
Pitchers, 82 Mo. 379; Speck v. Riggins, 40 Mo. 405;
Mildrow v. Robin, 58 Mo. 331; Meir v. Blum, 80 Mo.
179; Widdecomb v. Childers, 84 Mo. 382; Mason v.
Black, 87 Mo. 329; Knox v. Brown, 103 Mo. 103; Taaffe
v. Kelly, 110 Mo. 127.    (2) The relations between co-
tenants in fee in lands are those of trust and confidence.
It is the law of the existence of such a tenancy.    Jones
v. Stanton, 11 Mo. 433; Barnes v. Boardman, 9 L. R.
A. 571; Newman v. Bank of California, 5 L. R. A. 467.
(3)    A tenant, in fee, can not destroy the title of,
disseize and oust his cotenant by removing an incum-
brance upon the common property imposed by their
common source of title, or by any intermediate grantor.
Such removal enures to the benefit of all of the tenants.
(4)    The records of the probate court, and the petition
and exhibits of the administrator for an order of sale,

disclosed the fact that the probate court had no juris-
diction over the land in controversy, or any part of it
that was sold. The administrator's deed was void.
Creech v. Childers, 156 Mo. 338; Martin v. Jones, 72
Mo. 23; Davis v. Briscoe, 81 Mo. 27; Fleckenstein v.
Baxter, 114 Mo. 193. (5) Purchasers in good faith
must be such as have no notice, nor knowledge, nor
means of acquiring notice and knowledge, either *in pais*
or of record, of the adverse claim, and who pay a full,
or reasonable market value. The respondents had full
notice and knowledge, in fact, and from the records, by
their chain of title up to the common source of title
before and after his death, and they paid only $750 for
property that was worth $1,000, as most of the witnesses
fixed its value. Poage v. Railroad, 24 Mo. App. 199;
Chouquette v. Barada, 28 Mo. 491; Bartlett v. Glascock,
4 Mo. 62; Rhodes v. Outcalt, 48 Mo. 367. (6) The re-
moval of an incumbrance upon the common property by
one co-tenant enures to the benefit of all, the incum-
brances affecting the interest of each alike, but when
the incumbrances affect the interest of only one of the
cotenants, the law is otherwise, in the manner of secur-
ing reimbursement for the outlay. In the one case a
demand for contribution from all *pro rata* must be
made, whilst in the other an offer of reimbursement,
in whole, must be made before a right of action accrues.
Cahoon should have demanded of appellant contribu-
tion; he never did, for none was owing. The Gray es-
tate, whose share was alone liable, never offered to re-
imburse him for his outlay. This seems to be the rule
in this State if not so in others. The demand should
first be made in both events. . (7) Estoppel *in pais,* or
of record, must be certain as to their general intent, to
the common intent, and to every particular intent, and
must have resulted to the gain of the one and of a loss
to the other. No such issue was tendered by respond-
ents, nor did their evidence tend remotely to prove it.
Desseunier v. Murphy, 22 Mo. 95; Lajoy v. Prim, 3 Mo.

529; Hempstead v. Easton, 33 Mo. 142; Sulton v. Dameron, 100 Mo. 141; Amey v. Ramsey, 4 Mo. 505; Bales v. Perry, 51 Mo. 449.

*B. B. Cahoon, Jos. J. Russell* and *Moses Whybark* for respondents.

(1)    The respondents' defense of another and a separate action pending, having been brought by Nalle to recover from Cahoon one-fourth of $1,050, the amount Cahoon had sold the O'Bannon and Parks land for, and the net rents on the same, was well pleaded, and was clearly proven by the item itself, from Nalle's petition and account in said pending action, and Nalle's attempt to explain away that written item in that separate action was futile.   Such plea so proven and the final judgment in the case of Nalle v. Cahoon and its satisfaction are sufficient to cause the affirmance of the judgment in the court below against Nalle in this suit. This appeal is an attempt by appellant to recover real estate, when in another action, he, by seeking to recover its proceeds and the net rents from it, ratifies the sale and deeds by Cahoon to O'Bannon, and Parks and wife, litigates his alleged money share in the land, and obtains a judgment in that suit, which is satisfied by him after he takes this appeal.   This appeal under the facts is inequitable.   Egan v. Mart, 71 Mo. App. 60.   (2) The attempt and labor of appellant in the court below, as in this court, is in this ejectment to seek to recover land, principally on alleged equities between him and Cahoon, of which O'Bannon, the present owner of the land, has no concern, and of which he had no notice, in the absence of which it was and is of no concern to O'Bannon what were the business transactions between Nalle and Cahoon.   (3) Appellant in a plain ejectment is seeking to recover land against an innocent grantee (Joseph W. O'Bannon) whose strict paper title is unquestionable.   (4) Only the legal title is in issue in

ejectment. Kingman v. Deveis, 143 Mo. 519; Clay v. Mays, 144 Mo. 376; Finley v. Babb, 144 Mo. 403. To recover in ejectment appellant must show a clear legal title to the land and present right of possession, which he failed to do. Equitable claims are not sufficient on which to base ejectment. Hall v. Gregg, 138 Mo. 286; Hunt v. Selleck, 118 Mo. 538; Williams v. Carpenter, 135 Mo. 32. (5) Even the outstanding deed of trust of Mary J. Gray, of August 21, 1890, to Hiram Beery, Jr., trustee, to secure the $250 note to Nalle, which he admits he sold, and no longer owns, though he claims he, as attorney, holds it for its owner to break for him (Nalle), if possible, the force of it being an outstanding title, was itself sufficient to defeat appellant's ejectment against O'Bannon inasmuch as he is, so far as concerns this ejectment, the only substantial defendant in this case. Sell v. McAnaw, 138 Mo. 267; Baker v. Nall, 59 Mo. 265; Gurno v. Jaints, 6 Mo. 330; Siemers v. Schrader, 88 Mo. 20; Bailey v. Winn, 101 Mo. 649; Eversole v. Rankin, 102 Mo. 488; Thompson v. Lyon, 33 Mo. 219; Norcum v. D'Oench, 17 Mo. 78. (6) The purchases by Cahoon of all the land and his open record of all his three deeds thereto in 1891 and 1892, and his subsequent possession, etc., destroyed any alleged tenancy between Nalle and Cahoon. Snell v. Harrison, 104 Mo. 158; Aubuchon v. Aubuchon, 133 Mo. 216; Smith v. Washington, 88 Mo. 475. The alleged promise of Cahoon was to pay the debt of another. No pretense is made that it was in writing. Hence it is within the statute of frauds. R. S. 1899, sec. 3418.

BURGESS, J.—This is ejectment for the possession of the following described tracts of land in Madison county, to-wit:

"Beginning at the southeast corner of survey No. 2135, and running north and along and with the eastern line of said survey so far that a line drawn westwardly on the same course with the south boundary line of

said survey, will include the improvements made by Powell Callaway, and on which Robert B. Gray lived and died; thence west so far that a line drawn southwardly on the corner of the eastern line of said survey, will include eighty acres, excepting therefrom four or five acres, more or less, sold to John Crissop and wife to John M. Teal; said tract of land being a part of the confirmation made by Congress to William Dillon, under Christopher Anthony; also northeast quarter of southeast quarter and northwest fractional quarter of section thirty-one, township thirty-three north, range seven, excepting, however, from said northwest fractional quarter a tract out of it containing 22.50 acres, more or less, conveyed by deed of Powell Callaway to Eliza H. Spira, dated January 11, 1859, recorded in the recorder's office, of said county and State, in book H, page 418. All the foregoing real estate being the same land conveyed to Robert B. Gray by Powell Callaway by deed dated November 7, 1865, recorded in said recorder's office, in book K, at page 178, containing in all about 171 acres, being a part of the homestead property on which Robert B. Gray lived and died.''

Ouster is laid October 28, 1897.

The answer of defendant Thompson is first a general denial. It then proceeds as follows:

''Defendant Thompson states that he is in possession of said real estate described in plaintiff's petition, as the tenant of his co-defendant, Joseph W. O'Bannon, who claims, and is the owner of said real estate and to whom it was conveyed on October 28, 1897, by Benjamin Benson Cahoon, the deed to which is recorded in the recorder's office of Madison county, Missouri, in deed book 24, page 180; that said plaintiff, William N. Nalle, has pending in the circuit court of Madison county, Missouri, an action, as plaintiff, against said Cahoon, as defendant, wherein he, the said Nalle, seeks to recover from said Cahoon the said Nalle's alleged share of the purchase money so paid by said O'Bannon

to said Cahoon for said real estate by which said actions and conduct this defendant charges that said Nalle is and should be estopped from prosecuting this action, and that to do so is inequitable on his part, in that he should not in this court (which defendants pray to take cognizance of its own records) at one and the same time seek to recover said Nalle's alleged share of the money paid by said O'Bannon to said Cahoon for said real estate, for defendants state that by such suit against Cahoon by said Nalle, the defendants say that said Nalle admits and is bound to admit the conveyance of said real estate by said Cahoon, had good right to convey said land to said O'Bannon, and that he, the said Nalle, looks to and seeks to obtain from said Cahoon his alleged share (if any he has therein) of the money paid by said O'Bannon for the whole of said real estate.

"Defendants further allege that by reason of the premises, the present action by said Nalle is inequitable and inconsistent with his said suit against said Cahoon, and is wholly unjust; that by this suit said Nalle is seeking to and is making of this court a vehicle to prosecute two suits at the same time, in the same court, for practically the same subject-matter, in that this alleged suit being for the recovery of said estate by Nalle, and his said other suit against said Cahoon being for the recovery against said Cahoon by said Nalle of his alleged share or interest in the proceeds of the sale of said real estate sold by said Cahoon to said O'Bannon, by which action the said Nalle, in fact as well as in equity, admits said Cahoon has good right and title to convey said real estate to said O'Bannon, and said Nalle thereby assumes the position that he, the said Nalle, is entitled to and seeks from said Cahoon his, the said Nalle's alleged share of the money so received by said Cahoon from said O'Bannon for said real estate; that to permit said Nalle to prosecute this action while his said action against said Cahoon, as it is now pending, as aforesaid, is inequitable, and is trifling with this

court; hence defendants pray that this cause be dismissed and stricken from the docket. Defendants demand all other and further proper relief to which they may be entitled as well as judgment for costs of suit.''

The replication is in effect a general denial.

The case was tried by the court, a jury being waived.

It was admitted on the trial that Robert B. Gray is the common source of title and that he died about August 1, 1890, without heirs; that his widow survives, and that she elected to take one-half interest in fee in all deceased husband's lands in lieu of dower. That this was done August 26, 1890, in writing, duly acknowledged and recorded in the recorder's office of said county, and in the office of the probate judge of said county. It was also admitted that letters of administration were duly granted upon the estate of said Robert B. Gray and the estate finally settled.

Plaintiff then read in evidence a warranty deed from Mary J. Gray to William N. Nalle and B. B. Cahoon, for the land in question, dated July 16, 1891. This deed recites that: ''There are the following incumbrances upon parts of said land, viz.: one to secure a promissory note made payable to Joseph P. Gabriel, which embraces the eighty acres in survey 2135, and the northeast quarter of the southeast quarter of section thirty-one, township thirty-three north, of range seven east; one to secure a promissory note executed to William A. Hudson, which covers the twenty-one acres last above described, executed and delivered by said Robert B. Gray in his lifetime, and one promissory note executed and delivered to William N. Nalle, which covers the said eighty-acre tract, the twenty-one-acre tract and the northeast quarter of the southeast quarter of said section thirty-one. So far as homestead and dower, and one-half the fee thereon, executed to him by said Mary J. Gray, it is the intent of this deed to convey to said grantees the said above-described lands, together with

all of the grantor's title, right, claims, interest and estate therein in fee absolutely, subject only to said liens thereon as above designated.''

Plaintiff then introduced evidence with respect to the rents and profits of the premises, and rested.

Defendants then read in evidence over plaintiff's objection a deed of trust dated October 28, 1889, executed by Robert B. Gray and Mary J. Gray to J. F. Edwards, trustee for J. P. Gabriel, and duly recorded, conveying the land in controversy, to secure a note for $150 due twelve months after date. Next a deed executed April 25, 1892, by R. P. Callaway, sheriff of Madison county, acting trustee, under said deed of trust, conveying the same land described in said deed of trust to B. B. Cahoon. This deed was recorded on the day of its date. Also administrator's deed made by M. A. Jackson, administrator of Robert B. Gray, deceased, on May 11, 1892, to B. B. Cahoon, and duly recorded, conveying to him the land in question or part of it. Defendants also read in evidence over plaintiff's objection, a notice in writing signed by Mary Gray, dated February 8, 1892, and addressed to the probate court of Madison county, in which she stated that she consented that the real estate of her late husband, Robert B. Gray, in Madison county, be sold for the payment of his debts, and waiving all notices on her part as to such sale. Also deed from B. B. Cahoon and wife to Joseph O'Bannon, dated August 28, 1897, and duly recorded on November 12, 1897, conveying to him said land. Also deed of trust on one undivided half of twenty-one acres of said land, executed by Mary J. Gray to Hiram Berry, trustee for William N. Nalle, dated August 21, 1890, to secure the payment of a note for the sum of $200 executed by her to said Nalle. The defendants then rested.

Plaintiff then testified in rebuttal as follows:

''The incumbrances specified in the Mary J. Gray deed to Cahoon and Nalle were to be removed by Cahoon as his part of the consideration. Plaintiff's part was

his fee, including the note to him of $250, the retainer, amounting at that time to $1,000. That the promissory note for the $250 is now in plaintiff's possession and is held for collection, and to enable him to control the incumbrance, if any, upon his interest in the land in suit. Neither defendant, and particularly Cahoon, ever claimed one cent from plaintiff as contribution. Cahoon and myself were friends and acted together in many lawsuits. Cahoon was deaf and because of that defect employed me for his clients, and he paid me. Plaintiff was the sole attorney for the grantor, Mary J. Gray, charged with the murder of her husband. Cahoon having the means, was brought in the land deal to protect the title and, if needed, to pay off the incumbrances mentioned in the deed to plaintiff and Cahoon. Cahoon was first in full possession of the land. Plaintiff put full confidence in him, and asked no accounting from him till he claimed that plaintiff was indebted to him in January of this year (1899), nor had plaintiff thought to inquire what, if anything, he had done with the Gray land till that time. Upon examining the record and inquiring of defendant Thompson, and of Parks, plaintiff learned that Cahoon had utilized the Gabriel claim and the Hudson claim to acquire the entire title of the Gray estate and the equity of the widow Gray therein, as it affected the Nalle incumbrance, letting it out, as he now discloses for the first time, he intended to assert full title and to exclude plaintiff. Cahoon never paid any consideration to his grantor, Mary J. Gray, for her homestead right to the 160 acres which includes the land in suit. He paid $100 on the Hudson claim, and paid off the Gabriel claim, had it assigned to him, and then had it sold under the deed of trust and bought it in, getting the Gray estate title. Cahoon and defendants claiming under him never claimed contribution from plaintiff, and if any could have been claimed the rents would have more than paid plaintiff's part."

On cross-examination appellant testified as follows:

"Q.   You wrote the deed under which you claim title to you and Cahoon?   A. Yes, sir.

"Q.   It was made subject to the other claims, and the deed of trust made to Hy. Berry for you?   A. Yes, sir.

"Q.   Do you claim that under that deed from Mary J. Gray you have a legal title?   A. I got what title she had in her at that time.   I think the Gabriel note amounted to about $160.

"Q.   It was also under the deed of trust to Gabriel, and do you suppose it was made subject to that deed of trust?   A. Yes, sir.

"Q.   That deed of trust to Hy. Berry for you has never been satisfied?   A. Except as I have stated.   The trustee, not that I know, ever satisfied it.   The Robert B. Gray land was sold under the Gabriel deed of trust, and the deed discloses that Cahoon paid $605 for it.

"Q.   I understand that that sale was at the instance of Cahoon or Gabriel, and no matter what was the face of the note he paid $605 for the land at the trustee's sale under the Gabriel deed of trust?   A. I suppose he paid it, but, if so, it (the surplus) was never turned over to the estate.

"Q.   If Cahoon paid $605 under the Gabriel deed of trust and you had a deed of trust for $250, he paid all the land was worth?   A. He paid $100 for the Parks 21 acres, but it (the debt) was $123.47.   At the time he paid the Gabriel deed of trust there was due on it $179, and he stated in his letter to me that he bought from Gabriel.   This sale was at the instance of Cahoon, the owner of the note, otherwise he paid $179.90, and the $605 was never given the estate of Robert B. Gray.

"Q.   Well, as a matter of fact, he paid all that farm was worth?   A. My understanding was that the property was worth $2,000.

"Q.   Did the widow own it all?   The life estate and homestead?   A. The testimony shows the value of

the farm to be about $1,000, as the consideration we were to pay for that land. We estimated the Mary Gray interest at the value of $1,000, and took it—with the consideration of Cahoon was the payment, for his one-half of it, of the incumbrances. The Bob Gray interest was valued at $1,000.

"Q. Her interest was how much, $750? A. I don't know how much was due at that time. At the time of Cahoon's acquiring title he got the Bob Gray interest, one-half, for $179.90, and undertook to claim he paid off that incumbrance."

Appellant here closed and submitted the issue to the court. Thereupon the respondents' witness, B. B. Cahoon, testified as follows: "That he knew the land in controversy. The Gray homestead proper; that he knew the plaintiff; that he knew the deed executed by Mary J. Gray to himself and Nalle; that Nalle wrote the deed; that he knew of the incumbrance mentioned in the deed, the Gabriel, Hudson and Nalle trusts, at the time, July 16, 1891.

"Q. State if when that deed of Mary J. Gray was executed, or at any time, if the consideration was that you were to pay off these three deeds of trust named in the Mary J. Gray's deed to you and Wm. N. Nalle? A. No, sir; what interest I had under the deed is shown altogether on its face. After, or before, that deed was made to Nalle and myself it was never agreed by me that I was to pay off the incumbrances named in that Mary J. Gray deed. She, when it was made, had practically, in view of the deeds of trust made by Robert Gray and herself, and her election, but a very small interest. I simply ignored the deed of Mrs. Gray to Nalle and myself, in everything. I have done since I have taken steps to show that I had the title to the whole land.

"Q. Did you assist Judge Nalle in the selection of the jury and looking up the law? A. I will explain that and how the deed of Mary J. Gray was made.

Judge Nalle was employed to defend Mary J. Gray, charged with the poisoning of her husband. He. defended her successfully.  Pending her prosecution he said he wanted me to help him in the case.  I had taken Judge Nalle in a number of cases with me, in which I was original counsel and divided fees with him, and the judge, for his own reasons, stated that he wanted me to help him in that case.  Well, in the beginning I had taken him in many cases in which I was original counsel. I was pretty well informed on all questions of the law in those days and had a large business and a good library, but I could not hear the witnesses in court at all.  He then stated he wanted me to help him in that case against Mary J. Gray.  I said, 'Judge, you know I can't hear the testimony in court, and I will be of very little service to you.'  I never asked the judge to take me in his case in return, but as to what his motive was I can't say.  He asked me to help him in the Gray case.  Her acquittal was a surprise to the community. He said, 'I want you to help me anyway.'  I told him I would assist him in law and medical jurisprudence in the case, and in the selection of the jury, but I could not hear the testimony of the witnesses.  He said all well and good.  The case had been pending for some time. She had been arrested and she was then arraigned before the justice of the peace.  I rendered him what help I could.  I knew he received of Mary Gray the deed of trust to secure the $250 for his fee.  I never asked Judge Nalle to divide that fee.  I had been before dividing fees equally with him in cases in which I had taken him in.  I had a good run of business.  Well, while the matter was going on, after he got his fee secured by his deed of trust from Mary Gray to Hy. Berry, he said one day, 'I am going to make Mrs. Gray give us a deed to all her land, and I am going to pay you, so I can get more fees and you can get some.'  At the time it was made she had already made her election to take her child's part.  I knew of the Gabriel deed of

trust on the homestead proper. I knew of the Hudson deed of trust on the Parks 21 acres, and I knew of Judge Nalle's deed of trust to secure a $250 note. I knew the land was already incumbered, and knew of certain debts against the estate of Robert Gray. Judge Nalle was, as I supposed, very kind to me when he asked me to help him in the case. I never talked in my life to Mary Jane Gray about the deed she made to Nalle and myself; it was the judge's sole act and nothing was ever said about me paying the encumbrances. I never agreed to pay them directly or indirectly.

"Q. Do you believe now that Mrs. Mary J. Gray's equity of redemption was worth very much? A. I never expected to realize anything from the property; the deed of Mary J. Gray to Nalle and myself. I knew the property would be sold to pay the Robert B. Gray and wife deed of trust and Gray's. I had never placed any great expectations on this deed of Mary Gray to Nalle and myself.

"Q. State to the court, if whether before you got possession of the property the houses were burnt down? A. Before I got possession of the farm there was a large house with two old-fashioned rooms, then across the creek was an excellent log house and a stable. The buildings were all old except the log house. They could not all have been replaced for $450. The main house was an excellent log house with a large chimney, and good-sized timber in the logs and weatherboarded and ceiled inside. Every one of those three buildings were burned before I got possession of the farm.

"Q. Was the property sold under the Gabriel deed of trust? A. Yes, sir.

"Q. What did you pay for that property? A. What was paid by me at the time of sale under the Gabriel deed of trust was $605, and at the administrator's sale the amount paid by me was $355, and the administrator's deed shows that I also bought it at the administrator's sale; I paid the one to M. A. Jackson, adminis-

trator of Robt. B. Gray, and the other to R. B. Callaway, sheriff of Madison county, Mo., and ex-officio trustee under the deed of trust of Robt. B. Gray and wife to J. P. Gabriel.

"Q. State whether you paid other expenses on that farm? A. At the time that I bought the Gray land I told Judge Nalle that if I got my money back I had invested on this property, he and I would divide the profits. I expected at that time to make something out of the place. I served notice on Mary Gray to vacate the premises, but before she did so she burnt the houses, thereby depreciating largely the property and scaring off buyers for it, and she was sent to the penitentiary for six years. I tried for years and years to sell the property, and at last I sold the Gray homestead property, the property in the suit, to Joseph B. O'Bannon.

"Q. How much did you get from O'Bannon? A. I believe $750. The place when I bought it was run down. There was something about forty acres in cultivation, and to make a long story short, I believe I had it for five years. All except two years I rented it, and kept up the repairs. I got about $125 net rents.

"Q. How did you come out of the deal? A. At the little end of the horn. Counting interest on the two places, and what I paid out for taxes, fencing, fertilizer, etc., I came out loser about $380.09. The Parks place cost me $100; that was $12.50 per acre. I made about $150 on the Parks 21 acres, but am loser on the Gray farm I sold to Joseph O'Bannon.

"Q. You made about $150 on the Parks place and lost $380 on the other land? A. Yes, sir.

"Q. State whether Judge Nalle ever offered to pay one-half on these premises? A. No, sir; after I sold the 21 acres, six years last January (1899) and then, in January, 1899, Judge Nalle for the first time claimed that I had got big money for my investment in these Robert B. Gray lands.

"Q.    State if he is not now suing you in this court for the proceeds of the sale of the O'Bannon land?

"To which plaintiff objected, as it was not the best evidence, the petition being the best, and that it called for the witness's opinion.   The court overruled the objection, and plaintiff excepted at the time.

"A.    Yes, sir; and is asking judgment for the proceeds of the sale of this land.   He is asking judgment for one-fourth of $1,070, the whole amount received by me from both O'Bannon and Parks.   He is seeking to recover judgment for one-fourth of this sum.   O'Bannon lives in Colorado.

"Q.    Did he know anything about Nalle having any claim to the property?    A.    He is a perfectly innocent purchaser.   He came here on a visit at the time I sold him this property, and he had no idea that anybody had any claim to the property."

On cross-examination, he stated:

"Q.    Benson, when I was working in the Gray case, didn't I tell you, in your office, that I could not take you because she would not tolerate you to be in the case?    A.    If you told me, I don't remember it.

"Q.    Didn't I tell you at the time that we would take that deed and share equally in the estate?    A. No, sir; I never heard you say anything about it.

"Q.    Don't you know that when you bought at the administrator's sale, that was a voluntary payment on your part, when you owned the Gabriel note (title)? A.    I bought that to get clear title to this property.

"Q.    Then at the Gabriel sale you got the entire homestead?    A.    Yes, sir.

"Q..   The incumbrance was $185?    A.    I don't know what it was.

"Q.    You say you paid $605 on the Gabriel deed of trust sale?    A.    Yes, sir.

"Q.    You had that note allowed against Bob Gray? A.    No; if I had an allowance, it was money which was due to me individually.

"Q.   Now, don't you know that that money, $605,
less the $185 Gabriel debt, was never turned over to the
estate?   A.   That did not concern me.

"Q.   The $185 was the incumbrance; it was as-
signed to you at the time you were cotenant with me,
at the time you got the Gabriel debt?   A.   Yes, sir.

"Q.   Was it not your business to see where it
went?   A.   No, sir; I did not so consider it.

"Q.   At the time you received the title from Mary
J. Gray you knew I paid the purchase money.   Did you
not know that for my services the $250, as you state in
your answer to my petition, was the retainer for my ser-
vices rendered her in the justice of the peace court?   A.
I did not know what your contract was with Mrs. Gray.

"Q.   Didn't you know it was the retainer alone?
A.   I didn't know what your $250 was.   I considered it
was your fee in that case.

"Q.   You were then able to pay off this incum-
brance?   A.   Yes, sir.

"Q.   You knew that all that had been against the
Gray property was the Hudson note and the Gabriel
note, also the note of $255?'   A.   That is all in Bob
Gray's lifetime.

"Q.   Now, the other liens were general creditors;
the general creditors could only take part interest in
the Bob Gray estate?   A.   I can't swear as to that.

"Q.   You became owner in part with me in the
Mary Gray interest in that land prior to your acquiring
any title to that land?   A.   I believe the deed of Mary
J. Gray to Nalle and Cahoon was dated July 16, 1891.
The deed itself answers your question.   The deed of
R. P. Callaway, under the Gabriel trust, to B. B. Ca-
hoon, seems to have been executed on April 25, 1892.

"Q.   You became owner under the deed of trust
to Hudson prior to the time you bought at the Callaway
sale?   A.   About two weeks before.

"Q.   I will ask you if you were not to pay off these
incumbrances?   A.   You, nor anybody else, never told

me that you expected me to pay off that incumbrance, and I never agreed to do so, or expected, or intended to do so.

"Q. Under that sheriff's deed you took possession of the whole estate? A. I took possession of the estate under the Hudson deed.

"Q. You stated awhile ago that you took possession of the estate under the Hudson deed of trust? A. Not till after both sales, under it and the Gabriel deed of trust.

"Q. You had before the administrator's sale the title under the sheriff's sale? A. Of the homestead proper, I think I had.

"Q. You bought at the administrator's sale? A. Yes, sir.

"Q. Did you at any time from the time of this transaction up to the present time claim that I owed you anything, or ask me to contribute for acquiring the title to that property? A. Judge, I had lost money on that property. Buying the property as I have explained under the two deeds of trust and the administrator's sale, it was mine, and I did not ask you.

"Q. You knew that under that deed to you and me from Mary Gray we were cotenants in common to that land? A. In a sort of legal sense I suppose we were. I acquired my legal title from the Callaway deed of trust and from the administrator's sale.

"Q. You knew that I never received from Mary Gray one dollar except that note? A. I don't know what you received. I heard shortly afterwards that you had cashed that note.

"Q. You didn't consider that a reasonable fee in that case? A. A very reasonable fee for you Judge, had you received it, would have been $5,000 for the saving, as you did, of her neck. Mary J. Gray never had enough land, or property, to pay you for what your services were worth to her, for you, in my judgment, saved her from hanging."

(Witness, in all of the cases in which he was senior counsel, and in which appellant assisted, collected the fees and paid appellant one-half, as he says, amounting to about $2,000.)

"Q. From the time of our acquiring title up to the present time you never asked me for contribution? A. No; I told you three or four times that I came out of the little end of the horn.

"Q. Now, here, we were cotenants in common (in fee) under that Mary J. Gray deed and you had possession of the property from that time up to the present time? A. In a legal sense I suppose we were in common, so far as what Mary J. Gray had left in that land after the deeds of trust and her election.

"Q. She elected to take a child's part? A. Yes, sir.

"Q. Then we owned the deed of Mary J. Gray? A. Yes, sir. With you for what it was worth.

"Q. You say that you didn't give us notice of your intention to pay off the liens against the homestead? A. I testified that, for I never paid off the Gabriel deed of trust and you know when I bought it. I kept nothing from you at all.

"Q. What have you claimed against me that you didn't inform me of? A. I informed you. You knew that the money was paid by me for the assignment of the Gabriel deed of trust. I don't believe that you suggested that I should buy at the administrator's sale.

"Q. Don't you know that no part of the $605 you paid at the sheriff's sale was ever paid into the estate, to the administrator of the Gray estate? A. I don't know what became of it.

"Q. Don't you know that you were the cause of paying both the $605 and the $100 you paid at those sales? A. I don't know anything about that. I don't know whether the money went back to the Robert Gray estate, or ours, because I was not concerned in the management of the Robert B. Gray estate."

Cahoon testified in behalf of the defendants, and denied substantially Nalle's statements with respect to the transaction out of which this litigation has grown. He also testified that at the time of the trial of this suit there was pending in the circuit court of Madison county an action by Nalle against him upon open account, in which one of the items is as follows:

"To said Nalle's fee in case of State v. Mary J. Gray, collected on sale of land to Wm. Parks and Joseph O'Bannon, net receipt by said Cahoon on such sales and rents, $1,070, of which said Nalle is entitled to one-fourth, $254."

The trial resulted in a judgment for defendants, from which plaintiff, after unsuccessful motion for a new trial, appeals.

It is well settled in this State that to support an action of ejectment, the plaintiff must be vested with the legal title to the land in question at the time of the commencement of the action, and that he can not recover upon a merely equitable title. [Ford v. French, 72 Mo. 250; Dunlap v. Henry, 76 Mo. 106; Turner v. Dixon, 150 Mo. 416.] Therefore, conceding that plaintiff and Cahoon acquired as tenants in common all of the right, title and interest of Robert B. Gray, and his wife, Mary J. Gray, in the land in question, by virtue of the deed by Gray and wife to them of date July 16, 1891, it was subject to the deed of trust then upon the land executed by Gray and his wife prior thereto, to-wit, on October 28, 1889, to J. F. Edwards, trustee for J. P. Gabriel, to secure the payment of a note for one hundred and fifty dollars, payable by the grantors in said deed to Gabriel, hence, Nalle and Cahoon only acquired by said deed to them the equity of redemption of Gray and wife in the land, or, in other words, the title subject to the deed of trust; then, when Cahoon purchased the land at the sale made by the sheriff of Madison county acting as trustee under the deed of trust, and received a deed therefor, he acquired the legal title to

the land, the effect of the sale and deed being the extinguishment of all right of Gray and wife in the land, and all persons claiming under them.

In Kingman v. Sievers, 143 Mo. 519, it is said:

"While in the action of ejectment the legal title to real estate is not always determined, the action by the express language of the statute can only be maintained by those who are 'legally entitled to the possession thereof,' in contradistinction to those holding an equitable claim or right thereto, that may on proper proceedings to that end be made legal so as to authorize an after-action of ejectment for possession for such real estate. It is the legal title only that is recognized as the ground of action, and the plaintiff must recover in ejectment, if at all, on the strength of that title, and not on the weakness of that of defendant, or that it has a superior equity to him. Plaintiff's interest in the land in suit, if it be conceded that S. P. Nichols paid to defendant the entire consideration therefor, was still equitable and not legal."

So that, whatever the equities between plaintiff and Cahoon may be, with respect to the land, as the legal title was at the time of the commencement of this suit in the defendant O'Bannon, plaintiff can not recover in this action.

It will not do to say that because Nalle and Cahoon were tenants in common in the land when Cahoon bought a prior title thereto it at once vested in them in common, although the deed was to Cahoon alone, for the title to the land can only be conveyed by deed, so that at most that deed only created in plaintiff an equitable one-half interest in the land.

While the facts might have formed the basis for a suit in equity, by Nalle against Cahoon for a decree for one-half interest in the land acquired by him through his deed from the trustee, upon the payment of an equal proportion of the expenses incurred by Cahoon in obtaining it (Van Horn v. Fonda, 5 Johns. Ch. 388; Baker

v. Whiting, 3 Sumner's Rep. 475; Nalle v. Parks, this volume, page 616) he can not maintain this action upon a title which is merely equitable. Nor would such a proceeding affect O'Bannon unless he be made a party thereto and it be shown that he had notice of plaintiff's equity at the time he purchased the land from Cahoon.

Moreover, the record discloses that on February 8, 1899, Nalle brought suit against Cahoon in the circuit court of Madison county on account for $2,273, which was pending at the time of the trial of this case, one of the items in which was for $254, being one-fourth of the purchase money received by Cahoon on this sale of land to William Parks and Joseph O'Bannon, and rents, which amounted to a confirmation of the sale of the lands by Cahoon to them, and should estop plaintiff from the prosecution of this suit, for he could not, either at law or in equity, claim both the land and the proceeds arising from its sale.

Finding no reversible error in the record, the judgment is affirmed. All of this Division concur.